### HUDSON v. CHICAGO, ST. P., M. & O. RY. CO.

(District Court, D. Minnesota, Third Division. June 4, 1915.)

1. CARRIERS ☞219—CARRIAGE OF LIVE STOCK—DELAY IN TRANSPORTATION—LIABILITY OF INTERMEDIATE CARRIER.

Under the Carmack amendment (Act June 29, 1906, c. 3591, § 7, 34 Stat. 595 [Comp. St. 1913, § 8592, pars. 11, 12]) to the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379), providing that any common carrier receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor, and shall be liable to the lawful owner thereof for any loss, damage, or injury to the property caused by it, or by any common carrier to which such property may be delivered, or over whose line it may pass, an intermediate carrier cannot be sued for delay in transportation of an interstate shipment of live stock, where the delay was not caused on its line, regardless of whether or not it had issued a bill of lading; the purpose of the amendment being to secure simplicity in the transportation of freight carried by several common carriers by localizing the responsible carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 950, 951; Dec. Dig. ☞219.]

2. STATUTES ☞215—CONSTRUCTION—INTENT OF LEGISLATURE.

In order to ascertain the meaning of the language of a statute relating to actions at law, the situation at the time of the passage thereof may be considered.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 291; Dec. Dig. ☞215.]

3. CARRIERS ☞218—CARRIAGE OF LIVE STOCK—ACTION FOR DELAY IN TRANSPORTATION—NOTICE OF LOSS—"REMOVAL."

In an action for delay to a shipment of live stock, the bill of lading for which required as a condition precedent to recovery a notice of loss before the stock was removed from destination, where the cattle were sold within a day or two after their arrival, such sale constituted the "removal," within the meaning of the bill of lading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696, 927, 928, 933–949; Dec. Dig. ☞218.

For other definitions, see Words and Phrases, First and Second Series, Removal.]

4. EVIDENCE ☞20—JUDICIAL NOTICE—SALE OF LIVE STOCK.

The court will take judicial notice of the way in which the sale of a shipment of live stock is handled in the stockyards at Chicago.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 24; Dec. Dig. ☞20.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action by Guy H. Hudson, special administrator of the estate of Halvor Engemoen, against the Chicago, St. Paul, Minneapolis & Omaha Railway Company. On defendant's motion for a directed verdict. Motion granted.

Action for damages for negligent delay in the transportation of two shipments of live stock from Montana points to Chicago, via South St. Paul. The lines of railway over which the shipments actually passed were Great Northern Railway from Montana points to South St. Paul, Chicago, St. Paul, Minneapolis & Omaha Railway from South St. Paul to Elroy, and Chicago & Northwestern Railway from Elroy to Chicago. At the close of all the testimony counsel for defendant moved the court to direct a verdict in favor of the defendant company, upon the following grounds: (1) That it appears from all the testimony that the Omaha Railway Company, the sole defendant, is an intermediate carrier; that there is no evidence of delay on its line, delay being the only basis of claim for damages involved in the complaint; but, on the contrary, it affirmatively appears from the evidence that there was no delay on the line of this defendant company. (2) Upon the ground that no notice of claim, as required by the contracts of shipment, was given by the plaintiff, or by plaintiff's intestate.

Charles A. Butler, of Chicago, Ill., and Paul J. Thompson, of Minneapolis, Minn., for plaintiff.

Richard L. Kennedy, of St. Paul, Minn. (J. B. Sheean, of St. Paul, Minn., of counsel), for defendant.

BOOTH, District Judge (after stating the facts as above). This motion by the defendant for a directed verdict is based upon two grounds, as I understand it, and in substance they are these: First, that the defendant railway company in the two particular shipments involved in this controversy was the intermediate common carrier in interstate commerce, that the cause of action stated rests upon delay by the common carriers, or some of them, and that the evidence in this case not only fails to show that the delay occurred on the line of the defendant common carrier, but affirmatively shows that there was not any such delay. Second, that no notice of claim for damages was given by the plaintiff's intestate, such as is required by the contracts under which these shipments were made.

The evidence in the case shows that there were two shipments made by the plaintiff's intestate from Montana to Chicago, via South St. Paul. The evidence further shows without contradiction that through bills of lading were issued covering the transportation of these cattle from the two points in Montana, where the shipments originated, to Chicago; further, that there was a through rate between the Montana points and Chicago, and that this through rate was charged and collected on these two shipments. The evidence further shows that when the cattle arrived in South St. Paul they were unloaded, and reloaded into other cars, and that at that time bills of lading from South St. Paul to Chicago were issued by the defendant company; the original bills, however, not being surrendered.

The evidence also tends to show that the running time between South St. Paul and Chicago was 24 hours; and it is admitted that the actual time consumed by these two shipments was, in one case 29 hours and in the other case 34 hours. The evidence also tends to show that there was a loss sustained on these two shipments of

cattle, and that it was due to the delay between these two points. The evidence fails to show that there was any delay on the line of this particular carrier, the defendant here. There is not sufficient evidence to go to the jury upon that question; so that the liability of the defendant, if it exists, must rest upon a liability on its part for the delay by the succeeding carrier.

[1] As I understand the plaintiff's position, it is that in an interstate shipment, where several common carriers are concerned, each common carrier is liable, not only for its own delay, if that results in damage, but also for delay on the line of each succeeding common carrier, by virtue of the provisions of the Carmack amendment to the Interstate Commerce Act; and especially is this true, it is claimed, if the intermediate common carrier issues a new bill of lading. The Carmack amendment, so far as it is involved in this case, reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." Act June 29, 1906, c. 3591, § 7, 34 Stat. 595 (Comp. St. 1913, § 8592, par. 11).

There is nothing in the wording of that amendment which refers expressly to the initial common carrier; nor, on the other hand, is there anything which refers expressly to the intermediate common carrier; but it is provided in express language "that any common carrier, * * * receiving property for transportation from a point in one state to a point in another state," first, shall issue a receipt or bill of lading therefor, and, secondly, shall be liable to the lawful holder thereof for certain specified losses.

[2] In construing the amendment, the question arises: What was the intention of Congress in passing the amendment? Was it the intention of Congress that, where a shipment in interstate commerce passed over the lines, we will say, of seven connecting common carriers, each one of them engaged in interstate commerce, that there should be seven bills of lading issued, one by each of the connecting carriers? Or, was it the intention of Congress that there should be but one bill of lading issued, viz., that by the initial carrier, which should govern and control the shipment from the initial point to the point of destination? The language of the amendment is not entirely clear on this point, and in order to ascertain what the real meaning of the language is it is allowable to look at the situation relative to actions such as the one at bar at the time when this Carmack amendment was passed.

At that time the different state courts by their decisions had adopted different rules relative to actions for damages by shippers against common carriers. In some states, in a case of interstate commerce,

where there had been several connecting common carriers, it was possible to sue the last of the connecting carriers, and by showing that the goods were delivered to the initial carrier in good condition, and that they were received from the last carrier in bad condition, a prima facie case was made out, and it rested then with the last carrier to exonerate itself from liability, so far as its line was concerned. In some states the rule was, when there were several carriers, and the initial carrier had undertaken to carry to a point beyond its own line, that such initial carrier might be held liable, not only for loss or damage occurring on its own line, but also for loss or damage occurring on the succeeding connecting lines, on the principle of agency; that, having undertaken to carry to the point of destination, it made the connecting carriers its agents, and became liable for their acts. It was the rule in all of the states that a shipper might pick out from a route line of common carriers any particular common carrier, and sue it for loss or damage occurring on its own line; the burden of proof being upon him to show that the specific loss for which he claimed damage occurred on the line of the particular common carrier which he had picked out. It was the rule, in the federal courts and in some state courts, in case of a shipment over connecting lines of common carriers, that each common carrier might by contract limit its own liability to its own particular line.

Such, briefly stated, was the situation when this Carmack amendment was passed by Congress. The purpose which Congress had in mind in passing the amendment is stated in the case of Atlantic Coast Line v. Riverside Mills, 219 U. S. 185, on page 196, 31 Sup. Ct. 164, on page 166, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7, where the Supreme Court in its opinion, says:

"The undisputable effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce and 'receiving property for transportation from a point in one state to a point in another state' as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents."

The opinion, continuing further, says that there had grown up a custom among the railroads as follows:

"These railway companies, though separate in themselves, are in the habit, for their own advantage, of making contracts, of which this was one, to convey goods along the whole line, to the ultimate terminus, each of them being agents of the other to carry them forward, and each receiving their share of the profits from the last."

Further the opinion says:

"Along with this singleness of rate and continuity of carriage there grew up the practice by receiving carriers, illustrated in this case, of refusing to make a specific agreement to transport to points beyond its own line, whereby the connecting carrier for the purpose of carriage would become the agent of the primary carrier. The common form of receipt, as the court may judicially know, is one by which the shipper is compelled to make with each carrier in the route over which his package must go a separate agreement limiting the carrier liability of each separate company to its own part of the through route. As a result the shipper could look only to the initial carrier for recompense for loss, damage, or delay occurring on its part of the route. If such primary carrier was able to show a delivery to the rails of the next succeeding carrier, although the packages might and usually did continue the

journey in the same car in which they had been originally loaded, the ship-per must fail in his suit. He might, it is true, then bring his action against the carrier so shown to have next received the shipment. But here, in turn he might be met by proof of safe delivery to a third separate carrier. In short, as the shipper was not himself in possession of the information as to when and where his property had been lost or damaged, and had no access to the records of the connecting carriers, who in turn had participated in some part of the transportation, he was compelled in many instances to make such settlement as should be proposed. This burdensome situation of the shipping public in reference to interstate shipments over routes including separate lines of carriers was the matter which Congress undertook to regu-late. Thus, when this Carmack amendment was reported by a conference committee, Judge William Richardson, a Congressman from Alabama, speak-ing for the committee of the matter which it sought to remedy, among other things, said: 'One of the great complaints of the railroads has been—and, I think, a reasonable, just, and fair complaint—that when a man made a ship-ment, say, from Washington, for instance, to San Francisco, Cal., and his shipment was lost in some way the citizen had to go thousands of miles, prob-ably, to institute his suit. The result was that he had to settle his damages at what he could get. What have we done? We have made the initial car-rier, the carrier that takes and receives the shipment, responsible for the loss of the article in the way of damages. We save the shipper from going to Cali-fornia or some other distant place to institute his suit. Why? The reasons for inducing us to do that were that the initial carrier has a through route connection with the secondary carrier, on whose route the loss occurred, and a settlement between them will be an easy matter, while the shipper would be at heavy expense in the institution of a suit. If a judgment is obtained against the initial carrier, no doubt exists but that the secondary carrier would pay it at once.' "

Still further the court in its opinion says:

"The rule [under the Carmack amendment] is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility. The regulation is one which also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier."

Finally it says:

"In substance Congress has said to such carriers: 'If you receive articles for transportation from a point in one state to a place in another, beyond your own terminal, you must do so under a contract to transport to the place designated. If you are obliged to use the services of independent car-riers in the continuance of the transit, you must use them as your own agents, and not as agents of the shipper.' "

It seems to me that, in view of the opinion of the Supreme Court in that case, the real purpose of the Carmack amendment was to se-cure simplicity in the transportation of freight carried by several com-mon carriers—as the Supreme Court express it, "unity of transpor-tation with unity of responsibility * * * by localizing the re-sponsible carrier." Now, if that is the purpose of the amendment, the question arises: Would that purpose be effected by requiring each one, we will say, of seven connecting common carriers in an interstate shipment to issue a separate bill of lading? If this were done, we would have, on plaintiff's theory, seven common carriers, six of whom would stand in the position of principals to succeeding carriers, and also six in the position of agents of the preceding carriers. All seven of them would stand in the position of principal, so far as their own lines of railway were concerned. Instead of having localized the rem-edy, it would needlessly expand and extend it. For loss occurring

on the line of the last carrier the shipper might sue any one of the seven carriers. It is true that, before the Carmack amendment was passed, he might have sued any one of the connecting carriers for its own default, or he might, in some states, have sued the last carrier for loss occurring prior to the time when the shipment came into its hands; and, if the contract read in the way it might read, he could sue the initial carrier for loss or damage occurring, not only on its own line, but on the lines of the connecting carriers. But he could not sue an intermediate carrier for loss or damage occurring on the line of a succeeding carrier, unless it had contracted to that effect.

If this Carmack amendment is intended to simplify, rather than to render complex, interstate commerce and interstate shipments, and to unify and simplify, rather than multiply and mystify, the remedies of the shippers in obtaining compensation for their losses, it seems to me that it cannot bear the construction, claimed by plaintiff, that each common carrier in the line may be sued, not only for its own default, but for that of any succeeding carrier. The only case cited directly in point is the case of Looney v. Railway Co.,[1] recently decided by the Illinois Court of Appeals. The decision in that case holds, as I read it, that the intermediate carrier in a line of connecting carriers is under no obligation to issue a bill of lading; but, if it does so, then it comes within the purview of the Carmack amendment, and becomes liable for a default by a succeeding carrier.

With the highest respect for and deference to the court which decided the Looney Case, I am nevertheless unable to assent to the conclusion therein reached. The Carmack amendment specifically provides that, when a common carrier receives property for transportation in interstate commerce, it shall issue a bill of lading. If that applies to each one of a line of carriers, then it is not optional with the intermediate carrier whether to issue a bill of lading or not; and if the Carmack amendment applies, the last common carrier is also obliged to issue a bill of lading. It seems to me that such was not the intention of Congress in passing the amendment. If the Carmack amendment does not compel the intermediate carrier to issue a bill of lading, then the obligation cannot be assumed by the intermediate carrier by the issuance of a bill of lading; for that would be allowing the intermediate carrier to give at its option special privileges to a shipper, without having these special privileges set out in its tariff on file, and that would be a violation of the Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584). So it seems to me that neither in the absence of a bill of lading, nor by issuing a bill of lading, can the intermediate carrier be held liable for loss or damage occurring on the line of the succeeding carrier.

[3] As to the second point, that there was no notice of claim given in this case by the plaintiff's intestate, as required by the bill of lading: The original bill of lading issued by the Great Northern Railway Company contained this clause:

"The party of the second part further agrees, as a condition precedent to his right to recover any damages for any loss or injury to said stock, he will give notice in writing of his claim therefor to an officer of said first party, or to its nearest station agent, before said stock has been removed from said

[1] 192 Ill. App. 273.

place of destination, and before said stock has been mingled with other stock, when possible to do so, but in any event within 15 days."

The loss or damage claim in this case was made in November. The first shipment arrived on October 22d, and the last one on October 29th, but no point is made that the claim was not presented within 15 days, and there is no defense of this kind set up in the answer.

[4] But the defense is that the stock was either mingled with other stock, or had been removed from the point of destination, before any notice was given. I think there is no evidence of mingling of the stock with other stock. The evidence does show, however, without contradiction, that these cattle were sold within a day or two after their arrival in Chicago; and while there is not any direct evidence that the cattle were removed from the pens in which they were when they were sold, I think the court should take judicial notice of the way in which business of that kind is handled in the stockyards in Chicago; and the conclusion is irresistible that, if these cattle were sold within a day or two after their arrival, they were removed from the place of destination, within the meaning of the words as used in this provision of the contract. The question whether or not such a clause as that above quoted is valid is not an open one in this court. Our Circuit Court of Appeals, in Clegg v. Railway Co., 203 Fed. 971, 122 C. C. A. 273, has held that a provision of that kind is valid, and that, if the provision is not carried out on the part of the plaintiff, it is fatal to his claim. This contract was made prior to the amendatory act of March 4, 1915, c. 176, 38 Stat. 1196. Accordingly, under this decision of our Circuit Court of Appeals, the second ground of the motion must be sustained.

My conclusion is, therefore, that the motion for a directed verdict in favor of the defendant must be granted on both grounds presented. It is so ordered, and an exception to the ruling will be allowed.