Richmond.

THE CHESAPEAKE AND OHIO RAILWAY COMPANY OF INDI-
ANA V. NATIONAL BANK OF COMMERCE OF NORFOLK.

March 21, 1918.

Absent, Prentis, J.

1. DECLARATION—*Assumpsit or Trespass on the Case.*—Where in
   the caption of a declaration the formal statement is made that
   plaintiff complains of the defendant "of a plea of trespass on
   the case," omitting the further words "in assumpsit," but the
   body of both of the two counts of the declaration allege a con-
   tract of carriage and the breach of it as the cause of action,
   the declaration must be considered as in assumpsit.

2. CARRIERS OF GOODS—*Contract of Carriage—Right of Action.*—In
   every case of an action for damages for breach of contract or
   breach of duty by a common carrier of freight to carry it
   safely, whether in assumpsit on the contract, or in tort for
   breach of duty, the right of action is dependent upon the ex-
   istence of a contract of carriage between the plaintiff and
   defendant at the time the alleged cause of action arose, which
   contract, however, need not have been an express contract, but
   may have arisen from the duty imposed at common law or by
   statute, State or Federal, in which case the contract will be
   implied in law from the duty imposed by the common law or
   by statute.

3. CARRIERS—*Connecting Carriers—Liability of Initial Carrier under
   Interstate Commerce Law.*—Congress by the Carmack amend-
   ment (34 St. L. 594) has declared, in substance, that the act
   of receiving property for transportation to a point in another
   State and beyond the line of the receiving carrier shall impose
   on such receiving carrier the obligation of through transpor-
   tation with carrier liability throughout. In substance Con-
   gress has said to such carriers: "If you receive articles for
   transportation from a point in one State to a place in another
   State, beyond your own terminal, you must do so under a
   contract to transport to the place designated."

4. INTERSTATE COMMERCE—*Carriers of Goods.*—Since Congress has
   occupied the whole field of interstate commerce by virtue of
   the interstate commerce act and its amendments, those

statutes have superseded all State legislation on the subject and they and their construction must be alone looked to in the ascertainment of the rights of parties litigant in all actions, such as that in the instant case, involving an interstate shipment. .

5. INTERSTATE COMMERCE—*Connecting Carriers—Liability of Initial Carrier.*—Under the interstate commerce act and its amendments, if an interstate shipment of freight is begun under an express contract of carriage between the initial carrier and the shipper, and subsequently a connecting carrier, en route of the shipment, beyond the terminal of the initial carrier, issues another contract of carriage to the shipper for a remaining portion of the original route and takes up the original bill of lading evidencing the original contract upon its surrender by the shipper, the second contract of carriage does not supersede the first, and in such case the first contract remains in force by virtue of said Federal statute law and the shipper and all assignees of his claiming through him (all of whom could have enforced such original contract), have no right of action for damages against such subsequent carrier, but only against the initial carrier. In such case there can be, in contemplation of law, but one initial carrier and no action by the shipper or one claiming under him can be maintained, against any subsequent carrier en route, although instituted upon a subsequent contract of carriage with the latter, such as that aforesaid.

6. INTERSTATE COMMERCE—*Connecting Carriers—Liability of Initial Carrier—Implied Contracts.*—And the same would be true if the initial contract of carriage were not an express contract, but one implied in law because of the duty imposed by the Federal statute, where the initial carrier received the shipment for interstate transportation to a destination beyond the terminal of its line.

7. INTERSTATE COMMERCE—*Connecting Carriers—Liability of Initial Carrier.*—The doctrine set forth in the two preceding headnotes, however, is based upon the fundamental consideration that in such cases the initial contract of carriage was one which was enforceable by the plaintiff under the Federal statute, as covering the entire route of the original shipment; that any subsequent contract of carriage with any intermediate carrier was needless, was not required in such case by the Federal statute and was against its policy.

8. INTERSTATE COMMERCE—*Connecting Carriers—Liability of Initial Carrier—Tariff Regulation.*—Where owing to a lawful tariff regulation filed with the Interstate Commerce Commission according to law, the shipment of live stock from points west of

Chicago to points east of that place on shipper's order contract, i. e., on an "order notify" bill of lading, was invalid, the shipper or the consignee might make a second contract of carriage from Chicago to the place of destination of the live stock. Such second contract of carriage is not forbidden by the Interstate Commerce Law and its amendments, and the carrier with whom it is made becomes the initial carrier and is the proper defendant in an action for injury and damage whether caused by its own line or some connecting carrier en route from Chicago to the place of destination of the live stock.

9. CARRIERS—*Interstate Commerce—Tariff Regulation—Validity.*—A tariff regulation filed with the Interstate Commerce Commission according to law, forbade the movement of live stock on shipper's order contract, that is to say, on an "order notify" bill of lading east of Chicago, the regulation applying to all carriage of live stock freight on the lines of all common carriers east of Chicago on "order notify" bills of lading. It was contended that this tariff regulation was unlawful as to shipments of live stock from points west of Chicago orignally destined to points east of that place on "order notify" bills of lading, because such tariff regulation incidentally breaks, interrupts and stops such an originally intended through and continuous interstate carriage of freight.

*Held:* That as the interstate commerce law permits such a break, stoppage or interruption as may be made in good faith for a necessary purpose and without intent to avoid or unnecessarily interrupt such continuous carriage or to evade the provisions of the interstate commerce act, the tariff regulation was not forbidden by the Federal law.

10. CARRIERS OF GOODS—*Implied Contracts.*—If no express contract had been made with a carrier of live stock and the stock had been received by it for transportation, that state of facts would have constituted it the initial carrier for the entire route under the interstate commerce law as amended, and that carrier could alone have been sued for injury to the live stock en route, notwithstanding any subsequent contract of carriage between the consignee and an intermediate connecting carrier. But in the case at bar such were not the facts, for the live stock had been shipped under a shipper's order contract.

11. CARRIERS OF LIVE STOCK—*Liability—Interstate Commerce Act.*—The initial carrier of live stock, notwithstanding the interstate commerce act and its amendments, is only liable for some default in its common law duty as a carrier or for some default in the like duty of some of its connecting carriers.

12. CARRIERS OF GOODS—*Liability for Loss of Inanimate Goods—Interstate Commerce.*—At common law, upon the proof merely of delivery to a common carrier of inanimate goods for transportation and the proof of their non-delivery, the law implies that they have been lost by the negligence of the common carrier or by reason of some cause for which it is responsible, and the plaintiff suing for damages occasioned by such loss is relieved of the burden of proof of the cause of the loss. And this rule applies to the initial carrier of inanimate goods under the interstate commerce act and its amendments.

13. APPEAL AND ERROR—*Demurrer to Evidence.*—Where in an action against a carrier the evidence for the defendant tending to bring the case within a common law exception was in conflict with the evidence for the plaintiff tending to show a contrary state of facts, such evidence for defendant was waived by its demurrer to the evidence and cannot be considered on appeal.

14. CARRIERS OF GOODS—*Burden of Proof—Exception in Contract.*—In an action against a carrier for injury to inanimate goods consigned to it for carriage, where the carrier relies upon a special contract exempting it from liability, the burden of proof is on the carrier to prove that the injury falls within the exception contained in the special contract.

15. CARRIERS OF LIVE STOCK—*Burden of Proof—Exception in Contract.*—In an action against a carrier for injury to a shipment of live stock, where a contract exception is relied on as a defense, the burden of proof, at the least, is on the carrier in two particulars, namely: (a) It must prove that, at the time the injury may have occurred, the special contract exception relied on was in operation; and (b) it must *at least prove* (unless such fact appears from the plaintiff's evidence) that the injury was of such a nature that it may, with equal probability, in accordance with the evidence have been occasioned by causes which were within the contract exception relied on. Certainly this is true where the proof of the plaintiff shows that the injury was due to human agency.

16. CARRIERS OF LIVE STOCK—*Exception from Liability—Evidence—Case at Bar.*—A contract of carriage contained the following exception: "The shipper at his own risk and expense shall load and unload said live stock and in case any person shall accompany said live stock in charge of the same, (shall) take care of, feed and water said live stock while being transported, whether delayed in transit or otherwise * * *." The evidence for plaintiff was that the cars containing the stock were not overcrowded or over-loaded; that the stock was in sound and good condition when delivered to defendant for transportation; that

the injury to it apparent on its arrival at destination was of such nature that the jury were warranted in drawing the inference of fact that such injury was not occasioned by negligence in loading or unloading or in lack of care of it by any person accompanying the stock in charge of it, or from lack of feed or water. There was evidence for defendant in conflict with that of the plaintiff, but as the case was heard on the demurrer to the evidence, such conflicting evidence could not be considered.

*Held:* That the defendant had not proved by any evidence before the court that the injury complained of was of such a nature that it might with equal probability have been occasioned by causes which were within the exception from liability clause of the contract relied on by defendant. On the contrary, the evidence for the plaintiff established the affirmative fact that such injury was of such nature that it was not occasioned by causes within the exception.

Error to a judgment of the Law and Equity Court of city of Richmond, in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

This is an action of assumpsit by defendant in error (hereinafter called plaintiff) against the plaintiff in error (hereinafter called defendant) to recover damages for loss of certain live stock, consisting of fifty horses and eleven colts. In the caption of the declaration the formal statement is made that plaintiff complains of the defendant "of a plea of trespass on the case," omitting the further words "in assumpsit," but the body of both of the two counts of the declaration allege a contract of carriage and the breach of it as the cause of action and the declaration must be considered as in assumpsit.

The declaration in substance alleges a contract for a through, interstate shipment, entered into between the plaintiff and defendant by which the defendant as a common carrier, for a valuable consideration, undertook and prom-

ised to take care of and safely carry said live stock from Chicago, Ill., to Windsor, N. C., and to safely and securely deliver such stock to the plaintiff at the last named place; that the plaintiff caused said live stock to be delivered to the defendant at Chicago, Ill., on September 30, 1916, to be so taken care of and carried; that the defendant then and there had and received such live stock for such purposes; and that the defendant disregarded its duty as a common carrier and its said promise and undertaking in that behalf and so carelessly and negligently behaved and conducted itself with respect to said live stock that by and through the mere carelessness and negligence of the defendant and of its servants in this behalf the said live stock was afterwards *"wholly lost"* to the plaintiff (as alleged in the first count), and *"were so badly damaged and injured* that they became and were 'wholly lost" to the plaintiff (as alleged in the second count of the declaration).

There was a plea of "non-assumpsit" by the defendant, upon which issue was joined, and there was a trial by jury. A letter of plaintiff, treated as a bill of particulars, alleged that "while in transit at Hinton, W. Va., on October 5, 1916, on the line of the Chesapeake and Ohio Railway Company, through negligence of its employees, a number of these horses were killed and the remainder so badly injured as to make them of no value to the owner." After the introduction of the plaintiff's and defendant's evidence, the defend-ant demurred to the evidence, whereupon the jury found a verdict for the plaintiff, subject to the decision of the court upon the demurrer to the evidence. Thereafter the court overruled said demurrer, entered the judgment complained of in favor of the plaintiff in accordance with said verdict, and the defendant brings error.

## The Facts.

Considering the evidence as we must under the rule applicable thereto we find the following material facts to be disclosed thereby.

The contract of carriage alleged in the declaration was proved and shown to have been an express contract in writing made directly between the plaintiff and defendant. It was evidenced by a "uniform live stock contract" in lieu of a "uniform bill of lading," and was both a "receipt" and contract. It was in form made by the defendant with the shipper but was in fact made for the sole benefit of the plaintiff, the consignee—the shipper at that time had no interest in the live stock, having prior thereto assigned and transferred all of his interest therein to the plaintiff.

The contract did not obligate the plaintiff in person or by agent to accompany the stock for the purpose of giving care and attention to it. It did provide, however, that the plaintiff "at his own risk and expense shall load and unload said live stock, and *in case any person shall accompany* said live stock *in charge of the same,* (shall) take care of, feed, and water said live stock transported, whether delayed in transit or otherwise   *   *   *." (Italics supplied.)

The evidence for plaintiff on the latter subject was to the effect that no person accompanied said stock from Chicago en route to Windsor, N. C., "in charge of the same" or as employee or agent of the plaintiff.

The stock was properly loaded on two stock cars, at Chicago, were not over-loaded or over-crowded and were then in sound and good condition in every way as shown by direct and positive testimony for plaintiff. Such situation and condition of the stock was shown to have continued on to a point between Chicago and Cincinnati (not shown precisely what point by the evidence), when a witness for the plaintiff last saw the stock en route.

There is no evidence in the case for plaintiff or defendant showing the subsequent condition of the stock or what happened to it prior to its arrival at the point of destination, Windsor, N. C.

When the stock arrived at Windsor, N. C., (according to the testimony for plaintiff) it was in such a condition that the jury were warranted in drawing the inference of fact that it had been injured by human agency other than the over-loading or over-crowding of the stock on the cars, or in loading or unloading them, or from lack of care, or feed or water en route.

A portion of the testimony for plaintiff on this subject was as follows: "Some broke their legs, some dying and some had been dying in the car and some very poor, everything had been ruined, couldn't do anything with them, nobody would buy them. * * * broken up * * * All bunged up, all to pieces, and the feet, and the sides, holes where you could get your hands inside in their ribs. Q. What would make a hole like that? A. Where he jammed. Q. How many of those horses were in that condition? A. All of them. There were three good ones. * * whole lot of them dead." By another witness: "* * * they were torn to pieces badly. I recall one had a great piece of flesh torn out of the side of its face. I recall two or three colts and horses had pieces a foot long torn off the legs. There were tears of flesh on the sides. There were a good many of them bruised."

The other evidence from which the jury were warranted in drawing the inference of fact aforesaid, was indirect or circumstantial evidence, but it was ample. It would occupy too much space to recite it here. And such evidence as well as direct testimony for plaintiff as to personal examination of the stock prior to its reaching Chicago, must be taken on the demurrer to the evidence as establishing the fact affirm-

atively that the damaged condition of the stock as it appeared at Windsor, N. C., was not due to native vice, defects, disease, or fright of the animals or to over-loading or over-crowding of them, or in loading or unloading them, or from lack of care, or feed or water en route.

The acceptance of the shipment at Windsor, N. C., was refused by the plaintiff.

The market value of the stock uninjured as proved by the plaintiff, was ample to justify the amount of the verdict of the jury.

It was disclosed by the evidence for plaintiff that the live stock aforesaid was brought to Chicago on a contract of carriage entered into at Wyoming, evidenced by an "order notify" bill of lading, carrying title to the stock, which was attached to a draft of the shipper on the plaintiff, which was paid by the latter at Norfolk, Va., on September 30, 1916; such bill of lading and title to the stock thus coming to the plaintiff. On that day the plaintiff was informed by telegram received from the bank in Wyoming through which said draft and bill of lading had been forwarded to the plaintiff, that the two cars of live stock aforesaid were held in Chicago on account of "Eastern tariffs prohibiting movement of live stock on shipper's order contract," i. e., on a "order notify" bill of lading, and that such bank had instructed the defendant to "change order and ship direct" to plaintiff, and requested plaintiff to deliver the "order notify" bill of lading it then held "to agent Chesapeake and Ohio Railroad." Accordingly plaintiff that day (September 30, 1916) surrendered such bill of lading to the Chesapeake and Ohio Railway Company at Norfolk, as agent for the defendant, the Chesapeake and Ohio Railway Company of Indiana; and the plaintiff, in effect, thereupon requested the defendant to ship the live stock to it at Windsor, N. C., on the new and different bill of lading or contract of carriage, as was in fact subsequently done by defendant

as above set forth.  That the plaintiff did this because of the information it had received as aforesaid to the effect that defendant would and could not receive the said shipment at Chicago on the "order notify" bill of lading aforesaid, for the reason aforesaid, and because the plaintiff was required to surrender such bill of lading as aforesaid.

The plaintiff did not introduce said order notify bill of lading in evidence, it being no longer in its possession—nor indeed did it introduce the "uniform live stock contract" aforesaid, issued by defendant at Chicago, as the latter had not in fact come into its hands; but the defendant having the former bill of lading and a copy of the latter contract in its possession introduced them both in evidence in connection with its cross-examination of one of plaintiff's witnesses.

The "order notify" bill of lading aforesaid thus introduced in evidence by the defendant, showed on its face that it was given by the Union Pacific Railroad Company at Medicine Bow, Wyoming, on September 24, 1916, and was a contract of carriage between the latter company and the shipper, for the transportation of the live stock aforesaid from that point to Windsor, N. C., via Chicago and thence over the line of the defendant, and thence over the same route and lines of connecting carriers as the stock subsequently was in fact carried.  This bill of lading was assignable and passed to any subsequent holder of it by assignment from the shipper all the rights of the latter as against the Union Pacific Railroad Company growing out of such contract of shipment or arising from the Federal statute law on the subject.  It subsequently, and before the stock was accepted for carriage in Chicago by the defendant, came into the hands of the plaintiff as assignee of said original shipper, as aforesaid.

The evidence for defendant showed the fact that the said stock was received by the Union Pacific Railroad Company at Medicine Bow, Wyoming, on September 24, 1916, for the through interstate transportation aforesaid; that such contract of shipment was legal and valid for that portion of the route from Medicine Bow, to Chicago, but that because of a regulation of the eastern tariff filed with the Interstate Commerce Commission according to law, which regulation governed all railroads operating east of Chicago, the defendant was not permitted to receive said shipment of live stock at Chicago for transportation from thence to Windsor, N. C., and that for that reason it was not received by the defendant at Chicago for such continued shipment under the "order notify" bill of lading contract.

The "order notify" bill of lading aforesaid contained a provision making it obligatory on the *shipper* to "furnish to go with the stock for" (the purpose of loading and unloading, caring for, feeding and watering it, "until delivery of same to consignee at destination"), "one or more attendants," and further provided that "if the shipper fails to furnish such attendant or if the latter neglects to perform said duties, whatever shall be done by the carrier in respect to the handling and care of the stock in transit shall be considered as done at the request and as the representative of the shipper and at the risk and expense of the shipper."

There are two grounds of defence relied on by the defendant, upon appeal, namely:

1. That under the facts of this case the initial carrier was the Union Pacific Railroad Company as fixed by the Federal statute of February 4, 1887, ch. 104, 24 Stat. L. 379, 3 Fed. Stat. Anno. p. 809 *et seq.*, designated "an act to Regulate Commerce," as amended by the Carmack amendment, of June 29, 1906, 34 Stat. L. 594, Fed. Stat. Anno. Supp. 1909 p. 273, and by the Cummins amendment of

March 4, 1915, 38 Stat. L. 1196, Fed. Stat. Anno. Supp. 1916 p. 124, and by act of August 9, 1916, amending the Cummins amendment, that there can be but one initial carrier of an interstate shipment falling within the provisions of said Federal statute law, which alone must be sued for such damages as are claimed in the instant case; that the shipment in the instant case fell within such provisions, and hence that the plaintiff has sued the wrong defendant; that the plaintiff has no cause of action against the defendant in the instant case and hence its demurrer to evidence should have been sustained by the trial court.

2. That, if this be not a sound legal position, under the facts of the instant case it appears that persons accompanied the stock to take care of, feed and water it; that in such case the burden of proof to show the cause of the injury of the stock was upon the plaintiff; that the plaintiff introduced no proof, and there is none in the record, to show that the cause of the injury to the stock was the negligence of the defendant or its connecting carriers, and hence also the demurrer to evidence should have been sustained by the trial court.

The Federal statute law above cited, so far as material, is as follows:

The Carmack amendment, so far as material, reads:

"That any common carrier, railroad or transportation company *receiving property for transportation from a point in one State to a point in another State*, shall issue *a receipt* or *bill of lading* therefor and *shall be liable to the lawful holder thereof* for *any loss, damage or injury to such property*, caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or *regulation shall exempt* such common carrier, railroad, or transportation company from the liability hereby imposed: *Provided,* That nothing

in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company, on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof." (Italics supplied.) (34 Stat. L. 594; Fed. St. Anno. Supp. 1909; p. 273.)

The Cummins amendment, so far as material, reads:

"That any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one State or Territory or the District of Columbia, to a point in another State, Territory or the District of Columbia, or from any point in the United States to a point in any adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, *regulation,* or other limitation *of any character* whatsoever, shall exempt such common carrier, railroad or transportation company *so receiving* property for transportation from a point in one State, Territory, or the District of Columbia, to a point in another State, or Territory or from a point in a State or Territory to a point in the District of Columbia, or from

any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory shall be liable to the lawful holder of said receipt or bill of lading *or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not,* for the full actual loss, damage or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, *or in any tariff filed with the Interstate Commerce Commission;* and any such limitation, without respect to the manner or form in which it is sought to be made is hereby declared to be unlawful and void: *Provided, however,* That if the goods are hidden from view by wrapping, boxing, or other means, and the carrier is not notified as to the character of the goods, the carrier may require the shipper to specifically state in writing the value of the goods, and the carrier shall not be liable beyond the amount so specifically stated, in which case the Interstate Commerce Commission may establish and maintain rates for transportation, dependent upon the value of the property shipped as specifically stated in writing by the shipper. Such rates shall be published as are other rate schedules: *Provided, further,* That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: *Provided, further,* That it shall be unlawful for any such common carrier to provide by rule, contract, regulation or otherwise a shorter period for giving notice of claims than ninety

days and for the filing of claims for a shorter period than four months, and for the institution of suits than two years: *Provided, however,* That if the loss, damage, or injury complained of was due to delay or damage while being loaded or unloaded, or damaged in transit by carelessness or negligence, then no notice of claim nor filing of claim shall be required as a condition precedent to recovery." (Italics supplied.) (38 Stat. L. 1196, Fed. St. Anno. Supp. 1916, p. 124.)

The provision of the amendment which is added to the Cummins amendment by act of Congress of August 9, 1916, reads:

"Provided, however, that the provisions hereof respecting liability for full actual loss, damage or injury, notwithstanding any limitation of liability or recovery, or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply; first, to baggage carried on passenger trains or boats or trains or boats carrying passengers; second, to property, except ordinary live stock received for transportation concerning which the carrier shall have been or shall hereafter be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to value, be held to be a violation of section ten of this act to regulate commerce, as amended; and any tariff schedule which may be filed with the Commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared or agreed upon; and the Commission is hereby

empowered to make such order in cases where rates dependent upon and varying with declared or agreed value, would in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The term 'ordinary live stock' shall include all cattle, swine, sheep, goats, horses and mules except such as are chiefly valuable for breeding, racing, show purposes, or other special uses." (Italics supplied.)

Section 7 of the interstate commerce act aforesaid which remains unaffected by said amendments provides as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to enter into any combination, contract, or agreement, expressed or implied, to prevent, by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from the place of shipment to the place of destination; and *no* break of bulk, *stoppage,* or *interruption* made by such common carrier *shall prevent the carriage of freights from being and being treated as one continuous carriage* from the place of shipment to the place of destination, *unless such* break, stoppage or *interruption* was made *in good faith for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any of the provisions of this act."* (Italics supplied.)

*D. H. & Walter Leake* and *Henry Taylor, Jr.,* for the plaintiff in error.

*Tazewell Taylor,* for the defendant in error.

Sims, J., after making the foregoing statement, delivered the following opinion of the court:

The assignments of error present the questions for our

decision which will be considered and disposed of in their order as stated below:

1. Was the defendant, under the facts of this case, the initial carrier, as contemplated by the Federal statute law above mentioned?

As bearing on this question we will, in the outset, state certain general propositions about which there is no serious question made in argument before us, which are as follows:

In every case of an action for damages for breach of contract or breach of duty by a common carrier of freight to carry it safely, whether in assumpsit on the contract, or in tort for breach of duty, the right of action is dependent upon the existence of a contract of carriage between the plaintiff and defendant at the time the alleged cause of action arose, (10 C. J. sec. 130, p. 110); which contract, however, need not have been an express contract, but may have arisen from the duty imposed at common law or by statute, State or Federal, in which case the contract will be implied in law from the duty imposed by the common law or by statute.

It is immaterial therefore whether the action in the instant case was in assumpsit or in tort. The right of the plaintiff to maintain such an action, whether in assumpsit or in tort, depends, in the last analysis, on the existence of a contract of carriage between the plaintiff and defendant, either in fact or implied in law, at the time the alleged cause of action arose, and further upon such contract being an enforceable one under the law.

Prior to the Carmack amendment, above quoted, there were many conflicting decisions as to the circumstances from which the contract on which the right of action depended would be implied at common law, when it was for a through transportation of property designated to a point beyond the terminus of the receiving carrier's line. As said in *Atlantic C. L. R. Co.* v. *Riverside Mills*, 219 U. S. 186, at page 198, 31 Sup. Ct. 164, at page 167, 55 L. Ed. 167, at

page 179, 31 L. R. A. (N. S.) 7, at page 24: "Congress by
the act here involved (the Carmack amendment) has de-
clared, in substance, that the act of receiving property for
transportation to a point in another State and beyond the
line of the receiving carrier shall impose on such receiving
carrier the obligation of through transportation with car-
rier liability throughout." Again, at p. 36, in this opinion
of the United States Supreme Court in the case last cited, it
is said: "In substance Congress has said to such carriers:
'If you receive articles for transportation from a point in
one State to a place in another State, beyond your own ter-
minal, you must do so under a contract to transport to the
place designated.'"

Since the Congress has occupied the whole field of inter-
state commerce by virtue of the Federal statutes aforesaid,
those statutes have superseded all State legislation on the
subject and they and their construction must be alone looked
to in the ascertainment of the rights of parties litigant in all
actions, such as that in the instant case, involving an inter-
state shipment.

Further: The settled construction of the Federal stat-
ute law aforesaid is that if an interstate shipment of freight
is begun under an express contract of carriage between the
initial carrier and the shipper, and subsequently a connect-
ing carrier, en route of the shipment, beyond the terminal
of the initial carrier, issues another contract of carriage to
the shipper for a remaining portion of the original route
and takes up the original bill of lading evidencing the origi-
nal contract upon its surrender by the shipper, the second
contract of carriage does not supersede the first, and in such
case the first contract remains in force by virtue of said
Federal statute law and the shipper and all assignees of his
claiming through him (all of whom could have enforced
such original contract), have no right of action for damages

against such subsequent carrier but only against the in-itial carrier. In such case there can be, in contemplation of law, but one initial carrier and no action by the shipper or one claiming under him can be maintained against any subsequent carrier en route, although instituted upon a subsequent contract of carriage with the latter, such as that aforesaid. *Atlantic C. L. R. R. Co.* v. *Riverside Mills, supra; Looney* v. *Oregon Short Line R. R.,* 271 Ill. 538, 111 N. E. 509; *Hudson* v. *Chicago, etc., R. Co.,* 226 Fed. 38; *W. H. Alton Piano Co.* v. *Chicago, etc., R. Co.,* 152 Wis. 156, 139 N. W. 743; *Atchison, etc., R. Co.* v. *Harold,* 241 U. S. 371, 36 Sup. Ct. 665, 60 L. Ed. 1050. And the same would be true if the initial contract of carriage were not an express contract, but one implied in law because of the duty imposed by the Federal statute, where the initial carrier received the shipment for interstate transportation to a destination beyond the terminal of its line. *Hudson* v. *Chicago, etc., R. Co., supra.*

Such holding is based, however, upon the fundamental consideration that in such cases the initial contract of carriage was one which was enforceable by the plaintiff under the Federal statute, as covering the entire route of the original shipment; that any subsequent contract of carriage with any interstate carrier was needless, was not required in such case by the Federal statute and was against its policy, which was (as stated in *Hudson* v. *Chicago, etc., R. Co., supra),* "to secure simplicity in the transportation of freight carried by several common carriers—as the Supreme Court expresses it, 'unity of transportation with unity of responsibility * * * by localizing the responsible carrier,' " (quoting from the case of *Atlantic C. L. R. R. Co.* v. *Riverside Mills, supra).* Further dealing with the question of the proper consideration of the Carmack amendment, the court in the *Hudson* v. *Chicago, etc., R. Co.* case *supra,* said:

"Now if that is the purpose of the amendment the question arises: Would that purpose be effected by requiring each one, we will say, of seven connecting common carriers in an interstate shipment to issue a separate bill of lading? If this were done we would have, on plaintiff's theory, seven common carriers, six of whom would stand in the position of principals to succeeding carriers, and also six in the position of agents of the preceding carriers. All seven of them would stand in the position of principals so far as their own lines of railway were concerned. Instead of having localized the remedy it would needlessly expand it  *.  *   *

"If the Carmack amendment does not compel the intermediate carrier to issue a bill of lading, then the obligation cannot be assumed by the intermediate carrier by the issuance of a bill of lading, for that would be allowing the intermediate carrier to give at its option special privileges to a shipper  *   *   *.  So it seems. to me that neither in the absence of a bill of lading, nor by issuing a bill of lading, can the intermediate carrier be held liable for loss or damage occurring on the line of the succeeding carrier.

"The first transaction has already settled the relation between the owner of the goods and the carrier and fixed the duties and liabilities of the carrier to such owner. A contract afterwards entered into between the shipper and another carrier manifestly cannot affect these duties and liabilities."

In all of the cases above cited, however, the plaintiff, either as a party to it or as assignee of the shipper who was such a party, could have enforced his claim of damages under the original contract, if the subsequent contract had not been made—there was no stoppage or interruption of the continuous carriage of the freight under the initial contract, made *for any necessary purpose;* hence, the subsequent contract did not fall within the permission given in section 7 of

the interstate commerce act to make it, and the making of it was in effect prohibited by the Carmack amendment. And subsequent amendments made such prohibition even more explicit. But for such prohibitory effect of Federal statute law, such cases would, of course, have held otherwise than they did, where the subsequent contract of carriage was in fact made without duress.

We come now to the consideration of the controverted question above stated.

The defendant relies on the authorities above referred to to sustain its position that in the instant case the Union Pacific Railroad was the initial carrier and could alone be sued by the plaintiff in the instant case.

The defendant especially relies on the case of *Atchison, etc., R. Co.* v. *Harold, supra,* to sustain the position that a change of consignee does not affect the matter.

As to the last named case the following should be said: Neither change of title to the goods (*Gulf Railway Co.* v. *Texas,* 304 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540) nor change of consignee while the goods are in transit does, of itself, affect the matter; but a change of contract (which is not invalid because prohibited by the Federal statute law aforesaid), by the substitution of a different contract from the initial contract, may affect the matter; and will, and, upon principle, must of necessity do so. For as we have noted above, such an action as that in the instant case can be maintained only as based directly or indirectly upon a contract of carriage existing between the plaintiff and defendant at the time the alleged cause of action arose. If then there was a subsequent contract between the parties to the action which was by them both substituted for a former contract of carriage of the same freight between other parties, and such second contract was not forbidden by law, the action must of necessity be based on the latter contract.

If indeed the latter contract was forbidden by law and the former contract was by force of statute law continued in existence, then, and then only, the action should be based on the former contract.

The pivotal question, therefore, just at this point in our consideration of the instant case is this: Was the second contract of carriage forbidden by law? This, in turn, depends upon the further question: Was the tariff regulation aforesaid forbidden by the Federal statutes aforesaid, as to shipment of live stock from points west of Chicago to points east of that place?

Now clearly such tariff regulation was not expressly forbidden by said Federal statutes. If forbidden at all it must have been by implication. The tariff regulation applied to all carriage of live stock freight on the lines of all common carriers east of Chicago on "order notify" bills of lading. The tariff regulation was, unquestionably legal and valid as to all such shipments originating at and east of Chicago. Its object plainly was merely to abolish "order notify" bills of lading contracts of carriage of the stock in the territory east of Chicago. It is not contended that this object was not in itself lawful. The contention is that the tariff regulation was unlawful as to shipments of live stock from points west of Chicago originally destined to points east of that place on "order notify" bills of lading, because such tariff regulation incidently breaks, interrupts and stops such an originally intended through and continuous interstate carriage of freight. The latter position manifestly depends upon whether the Federal statutes aforesaid forbid any break, interruption or stoppage in every originally intended through and continuous interstate carriage of freight, which has once begun, without exception. Now we see from the provisions of section 7 of such statute law above quoted that this is not so. Such a break, stoppage or interruption as

may be "made in good faith for * * * (a) necessary purpose and without any intent to avoid or unnecessarily interrupt such continuous carriage or to evade the provisions of this act,," is not forbidden by such statute law. We think that the reasonable construction of said Federal statute is that the tariff regulation aforesaid was not forbidden thereby to the extent of the incidental effect aforesaid; that the break, stoppage or interruption at Chicago of the originally intended through transportation from Medicine Bow in the instant case being made not "with any intent to avoid or unnecessarily interrupt such continuous carriage or to evade any provision" of the statute law aforesaid, but solely in order not to interfere with said tariff regulation, it was for a "necessary purpose" in contemplation of such statute. That, therefore, the first contract of carriage in evidence was invalid as a contract of carriage east of Chicago; and, hence, that the second contract of carriage was not forbidden by law but was a lawful and valid contract.

Taking up now the consideration of the cases cited and relied on for defendant as above noted upon the question under consideration, we deem it sufficient to say that the principle on which these cases were decided does not lead to the conclusion that the second contract of carriage in the instant case was forbidden by the Federal statute law. The instant case was not one where the transportation could have proceeded east of Chicago under the first contract of carriage. It was not a case where there was no necessity for a change of that contract into a new and different contract. The invalidity of the first contract under the lawful tariff regulation aforesaid was a sufficient justification of the defendant for requiring a new and different contract of carriage. The latter contract having been in fact entered into, and being a legal and valid contract, it superseded the former contract of carriage.

It is urged upon our consideration by defendant that the "order notify" bill of lading being illegal as a contract of carriage east of Chicago, it was to that extent a void contract; that a void contract is no contract and that hence the case stands as if no express contract had been made with the Union Pacific Railroad. That in such case the mere receiving of the stock by such railroad for transportation to Windsor, N. C., constituted it the initial carrier for the entire route. This position, however, overlooks the consideration that what we are asked to resolve into a fact by construction was not a fact, and cannot be implied or considered as existing consistently with the actual facts. If, indeed, no express contract had been made with the Union Pacific Railroad Company, and the stock had been received by it for transportation as aforesaid, that state of facts would undoubtedly have constituted it the initial carrier for the entire route to Windsor, N. C.; and the Union Pacific Railroad could alone have been sued by the plaintiff, notwithstanding any subsequent contract of carriage made between the plaintiff and an intermediate connecting carrier. But in such case there would have been no need for any such subsequent contract, the contract implied in law from the duty imposed on the Union Pacific Railroad Company by said Federal statute law would have been ample to have obligated it for the carriage of the freight for the entire route (by itself and through its connecting carriers as its agents). And in such case no connecting carrier would have had the lawful right to refuse such carriage on the ground that it would have been under an invalid contract. But the case before us is, as aforesaid, a very different one.

The conclusion, therefore, necessarily follows that the defendant, and not the Union Pacific Railroad Company, under the facts in the instant case, was the initial carrier as contemplated by the Federal statute law above cited.

Hence it follows that the defendant was the proper defendant to the action in the instant suit for the injury and damage complained of in the declaration, whether caused by it on its own line or by some connecting carrier en route from Chicago to Windsor, N. C.

Coming now to the question of the liability of the defendant for the injury and damages complained of—it was liable therefor if such injury and damage were due to the negligence or default in duty of the defendant or of some connecting carrier.

That is to say, the defendant, notwithstanding the Federal statute law aforesaid, is only liable for some default in its common law duty as a carrier or for some default in the like duty of some of its connecting carriers aforesaid. *Adams Express Co.* v. *Croninger,* 223 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257. In other words, it is liable only for negligence or default in duty at common law of itself, or of its connecting carriers aforesaid, and under the Federal statute law aforesaid is liable for such negligence or default in duty of its connecting carriers as if it were its own and had occurred on its own line. *Galveston, etc., R. Co.* v. *Wallace,* 223 U. S. 481, 32 Sup. Ct. 205, 56 L. Ed. 516.

Now at common law, upon the proof merely of delivery to a common carrier of inanimate goods for transportation and the proof of their non-delivery, the law implies that they have been lost by the negligence of the common carrier or by reason of some cause for which it is responsible, and the plaintiff suing for damages occasioned by such loss is relieved of the burden of proof of the cause of the loss. This rule applies to the initial carrier of inanimate goods under the Federal statute law aforesaid. *Galveston, etc., R. Co.* v. *Wallace, supra.* As there said "The carrier and its agents (the connecting carriers) having received possession of the

goods, were charged with the duty of delivering them or explaining why that had not been done. This must be so, because carriers not only have better means, but often the only means, of making such proof. If the failure to deliver was due to the act of God, the public enemy or some cause against which it might lawfully contract, it was for the carrier to bring itself within such exception."

Upon the trial in the court below one of the grounds of defense relied on by defendant was a common law exception, namely: that "The injuries to the animals shown in evidence may as well have been due to the inherent nature, vice or defects of the animals or to * * * fright * * * for which the carriers are not responsible, as to any cause for which the carriers were responsible." But this defense is not relied on before us, and indeed could not be successfully relied on before us for the reason that the evidence for defendant tending to bring the case within such exception was in conflict with the evidence for plaintiff tending to show a contrary state of fact, hence such evidence for defendant was waived by its demurrer to evidence and cannot be considered by us—the result being that we must consider that the defendant has failed to sustain the burden resting upon it, hereinafter referred to, to prove by a preponderance of the evidence that the injury to the stock complained of may have been due to causes within said common law exception relied on by defendant. Therefore, such common law exception need not be further specifically mentioned.

The defendant, however, does, before us, rely on a special contract exception as hereinafter more particularly set forth. Now in connection with the consideration by us of such defense the following should be said:

In the case of loss of inanimate freight it is not questioned by defendant that the common law rule stated in the quotation above from the case of *Galveston, etc., R. Co.* v. *Wallace, supra,* applies, and that the same common law rule

applies to *injury* and consequent loss or damage arising from *injury* to inanimate freight, and to any defense by such carrier, relying on exemption from liability in damages for *injury* to such freight by reason of any exception to the common law rule provided by contract. The burden of proof in such case is on the carrier to prove that the injury falls within the exception contained in the special contract relied on by the defendant. 6 Cyc. 519, 520; 10 C. J., sec. 577, pp. 574-5.

In the case of animate freight, however, there has been much diversity of opinion as to whether the common law rules applicable to inanimate freight exist in their entirety —whether the same burden of proof aforesaid rests upon the carrier in the event of loss of or injury to animate freight as to inanimate freight.

In considering this question no reference to the statute in Virginia or the rules of decision in Virginia or elsewhere on this subject, with respect to intrastate shipments, would be of any help in arriving at a right conclusion, since the liability for damages in the instant case is governed by the Federal statute law, and the common law rules applicable thereto as accepted and applied in Federal tribunals must govern. *Cincinnati, etc., R. Co.* v. *Rankin,* 241 U. S. 319, 36 Sup. Ct. 555, 60 L. Ed. 1022, L. R. A. 1917a, 265. Hence such statutes and decisions will not be referred to.

When we come to consider the common law rules under discussion as accepted and implied in Federal tribunals with respect to injury to animate freight, to-wit, live stock, in a case where a contract exception is relied on as a defense, whatever may be the difference in other of such rules as applicable to animate as distinguished from inanimate freight, there seems to be no room for valid dissent from the conclusion that the burden of proof, at *the least,* which is required of it in that behalf, is on the carrier in two particulars, namely: (a) It must prove that, at the time the injury may

63

have occurred, the special contract exception relied on was in. operation; and (b) it must *at least* prove (unless such fact appears from the plaintiff's evidence) that the injury was of such a nature that it may, with equal probability, in accordance with the evidence, have been occasioned by causes which were within the contract exception relied on. 6 Cyc. 524; 10 C. J., sec. 581, p. 379. Certainly this is true where the proof of the plaintiff shows that the injury was due to human agency. 6 Cyc. 524.

. In the instant case, while there was evidence for defendant to the contrary, there was ample evidence for plaintiff to establish the fact that the injury to the stock complained of was due to human agency, as appears from the statement of facts above, and on the demurrer to evidence this court must consider such as the fact in the instant case.

In the instant case the defendant relies on the special contract exception from liability contained in the contract of carriage with the Union Pacific Railroad, quoted in the above statement of facts, and also on the special contract exception from liability contained in the contract of carriage with the defendant, also quoted in the above statement of facts. Since, for the reason above stated, this action is not based upon the former contract, the exception from liability clause thereof cannot be relied on by the defendant. This leaves the defense under consideration entirely dependent upon such clause of the latter contract of carriage.

Now, since the burden of proof at the least which is required of it, as above noted, is upon the defendant in both of the particulars above mentioned, if the defendant has failed in its proof in either particular, such failure is fatal to its defense now under consideration.

It is urged upon our consideration by defendant that the testimony for the plaintiff, when read in connection with certain entries on the contract of carriage with defendant,

shows that the stock was accompanied by persons in charge of it within the meaning of clause 5 thereof, relied on by defendant, so that such exception clause was put in operation in the instant case, whereas it is urged on the part of the plaintiff that the fact in question is not directly proved but that it is a mere inference, which the defendant, as demurrant to the evidence has deprived itself of the right to draw; but, as we shall presently see, it is unnecessary for us in the instant case to pass upon that controverted question.

Nor is it necessary for us to consider the ground of defense mentioned in the above statement of the case, to-wit, that the burden of proof to show the cause of the injury to the stock was on the plaintiff because the stock was accompanied by persons to take care of, feed and water it. It is not necessary for us to consider such ground of defense because such burden of proof, if it were conceded to exist, did not arise unless the defendant had at least shown by a preponderance of the evidence which can be considered by us that the injury to the stock was of such a nature that it may, with equal probability as aforesaid, have been occasioned by causes which were within the exception from liability clause of the contract aforesaid on which such ground of defense rests. This, as aforesaid, we shall presently see the defendant has failed to do.

The pivotal question then, upon which the defense under consideration turns, and upon which its decision depends in the instant case, is, therefore, the following:

2. Has the defendant sustained the burden of proof resting upon it, at the least which is required of it in that behalf, to show by a preponderance of evidence, (b) that the injury to the stock was of such a nature that it may, with equal probability in accordance with the evidence in the case, have been occasioned by causes which were within the

exception from liability clause aforesaid of the contract of carriage with defendant?

The exception from liability clause aforesaid of the contract of carriage with defendant, above quoted, is as follows:

"Sec. 5. The shipper at his own risk and expense shall load and unload said live stock and in case any person shall accompany said live stock in charge of the same, (shall) take care of, feed and water said live stock while being transported, whether delayed in transit or otherwise * *."

Now the evidence for plaintiff (as noted in the above statement of facts) was direct and positive that the cars containing the stock were not over-crowded or over-loaded; that the stock was in sound and good condition when delivered to defendant for transportation; that the injury to it apparent on its arrival at destination was of such nature that the jury were warranted in drawing the inference of fact that such injury was not occasioned by negligence in loading or unloading or in lack of care of it by any person accompanying the stock in charge of it, or from lack of feed or water. There was evidence for defendant, it is true, in conflict with that of the plaintiff on this question, but on the demurrer to evidence such conflicting evidence cannot be considered by us. It is, therefore, manifest that in the instant case the defendant has not proved by any evidence which is before us that the injury complained of in the declaration was of such a nature that it may with equal probability, as aforesaid, have been occasioned by causes which were within the exception from liability clause of the contract aforesaid relied on by defendant. On the contrary, the evidence for the plaintiff, as we must consider it, establishes the affirmative fact that such injury was of such nature that it was not occasioned by causes within such exception.

The question last above stated must therefore be answered in the negative.

For the foregoing reasons, we are of opinion that there was no error in the action of the court below in overruling the demurrer to evidence, and the judgment complained of will be affirmed.

*Affirmed.*