# Richmond

N. Y., Phila. and Norfolk R. R. Co. v. J. W. Chandler.

January 20, 1921.

Reheard April 6, 1921.

1. Appeal and Error.—*Record—Bill of Exceptions—Instructions.*— The instructions are no part of the record in an action at law unless made so by bill of exceptions or certificate in accordance with the statutory requirements on that subject. (Acts 1916, p. 722, now Code 1919, sec. 6252, or Acts 1916, p. 708, now Code 1919, sec. 6253.)

2. Appeal and Error.—*Record—Bill of Exceptions—Instructions.*— Section 6341 of the Code of 1919, providing that where the parties are unable to agree the judge shall decide what part of the record should be copied, has reference only to what is already a part of the record, and merely authorizes selections from the record as already completed. It does not authorize any additions to the record, and instructions which were not certified by the judge of the trial court within the period of sixty days fixed by statute (section 6252 of the Code of 1919) cannot be made a part of the record under the provision of this section.

3. Carriers of Goods.—*Damages for Delay—Whole Value of the Goods—Initial Carrier—Carmack Amendment.*—The loss and consequential damage which the plaintiff has suffered of the whole of the value of his goods, by reason of his loss of the sale of them, which he had made at a stipulated price, caused by negligent delay in the transportation, followed by the subsequent conversion of the goods by the wrongful sale of them by the terminal carrier, is within the operation of the "Carmack amendment," which makes the initial carrier who receives goods for interstate transportation liable "for any loss, damage or injury to such property, caused by it or by any common carrier * * * to which such property may be delivered or over whose line or lines such property may pass." U. S. Comp. St. sec. 8604a.

4. Carriers of Goods.—*Delivery Within Reasonable Time—Damages for Delay.*—If damage results from failure, without good excuse, to deliver the goods at their destination within a reason-

able time, the carrier is liable for such damage. When a carrier undertakes to convey goods, the law implies a contract that they shall be delivered at destination within a reasonable time, in the absence of any special agreement as to the time of delivery. And the principle applies although there is a written contract for the shipment which contains no stipulation as to the time within which the goods are to be delivered.

5. Carriers of Goods.—*Damages for Delay—Wrongful Conversion by Carrier—Loss of Sale at Stipulated Price.*—Where delay in the transportation has caused the loss of a sale at a stipulated price, such delay is the proximate cause of the loss to the plaintiff of the full value of the goods, where the subsequent action of the carrier in the wrongful sale of the goods has prevented the plaintiff from himself selling the goods on the market or taking any other steps to minimize the damage which he has suffered.

6. Carriers of Goods.—*Damages for Delay—Where There is no Conversion by Carrier.*—But where there is delay merely without conversion, even though the delay is such as to render the carrier liable, and the plaintiff still retains the ownership and control of the property, so that it is within his power to take some steps to minimize the damages, the measure of damages is not the full value of the goods, but the loss proximately caused by the delay.

7. Carriers of Goods.—*Carmack Amendment—Terminal Carrier as Warehouseman.*—The Carmack amendment (U. S. Comp. St., secs. 8604a, 8604aa) does not make the initial carrier liable for a loss of or injury to goods proximately caused by the conduct of the succeeding carrier while occupying the relationship of warehouseman.

8. Carriers of Goods.—*Termination of Liability—Liability as Warehouseman.*—The carrier remains liable until the goods have reached their destination and the consignee has had reasonable opportunity (involving notice of arrival when such notice is essential to charge him with the duty of taking the goods), to receive the goods from the carrier, and that, after the expiration of such reasonable time, the liability of the carrier, if the goods remain in his possession, is that of warehouseman only. The carrier is liable only as warehouseman after the consignee has refused to receive the goods, or while the goods are held by the carrier at the request and at the convenience of the consignee.

9. Carriers of Goods.—*Termination of Liability—Liability as Warehouseman—Case at Bar.*—Plaintiff delivered a carload of potatoes to defendant carrier to be carried to Atlanta, to the plaintiff as consignee, to be there delivered on written order

to a third party. Upon the delayed arrival of the potatoes at their destination the third party, having no written order from the plaintiff, refused to accept delivery.

*Held:* That thereupon the plaintiff became the unconditional consignee, and as such he was entitled to notice of the arrival of the goods, the refusal of the third party to qualify as consignee, and a reasonable time thereafter within which to make other disposition of the goods. The refusal of the third party, the conditional consignee, to receive the goods did not terminate the carrier's liability as carrier and render it liable as warehouseman only.

10. CARRIERS OF GOODS.—*Termination of Liability—Liable ·as Warehouseman—Reasonable Time to Make Disposition of Goods—Case at Bar.*—In the instant case, the time between the notice to plaintiff of the arrival of the goods at destination and the refusal of the conditional consignee to qualify as such, and the delivery by the terminal carrier of the goods to another for sale, four days, was not, under all the evidence, a reasonable time within which to make other disposition of the goods, and the relationship of carrier to plaintiff still remained that of carrier and not of warehouseman.

11. CARRIERS OF GOODS.—*Damages for Delay—Loss of Sale—Case at Bar.*—In the instant case the evidence was sufficient to support the verdict of the jury, which found, in effect, that there was unreasonable delay in the transportation of a load of potatoes delivered to defendant carrier by plaintiff, and that that delay was the occasion of the loss of a sale by the plaintiff to a third party, although the delay was only four days.

12. CARRIERS OF GOODS. —*Delay in Delivery—Burden of Proof to Explain.*—When evidence of unusual delay is adduced, a *prima facie* case of negligence is made out, and the burden then devolves on the carrier to explain the delay and to show that it arose from some cause other than the carrier's negligence or that of its agents or servants.

13. CARRIERS OF GOODS.—*Damages for Delay in Transportation—Loss of Entire Value of Goods.*—The general rule is that the measure of damages for loss of the entire value of goods occasioned by delay in the transportation of them is the market value of the goods at the place of destination at the time when the delivery of them should have been made, plus the other proximate damage.

14. CARRIERS OF GOODS.—*Damages or Delay in Transportation—Loss of Sale of Goods.*—But where, through the unreasonable delay of the carrier and its action in wrongfully disposing of plaintiff's goods to another, plaintiff loses the full value of

88

the goods, plaintiff's damages are to be estimated on the basis. of the price that plaintiff was to receive under a contract of sale to a third party, plus the other proximate damage, where: the stipulated price at which the goods were sold at the time. and place of shipment was much less than the market price at. destination when the goods should have arrived, so that the: market price at destination was greater than the stipulated. selling price, plus the freight. .

ON A PETITION FOR REHEARING, APRIL 6, 1921.

15.  Carriers of Goods.—*Liability of Warehouseman—Provision in: Bill of Lading for Removal of Goods—Carmack and Cummins Amendments.*—A bill of lading contained a clause that property not removed within forty-eight hours after notice of its arrival had been duly sent or given should be held subject to carrier's responsibility as warehouseman only. But where the goods are not accepted, the liability of the carrier, as carrier, under the Carmack amendment, does not cease until the expiration of a reasonable time for the removal of the goods after the giving of the notice to the party entitled to receive them, and such rule is unaffected by the above clause in the bill of lading; and even if the clause in the bill of lading in question were to be construed as attempting to fix an arbitrary limit of time within which the relationship of shipper and carrier should terminate, it would be void under the Cummins amendment, U. S. Comp. St., secs. 8592, 8604a.

Error to a judgment of the Circuit Court of Northampton county in a proceeding by motion for a judgment for damages.  Judgment for plaintiff.  Defendant assigns error.

*Affirmed..*

This action is upon the special contract of carriage set out in the notice of motion by which the suit was commenced.  The plaintiff in error was the defendant and the defendant in error the plaintiff in the court below.  The latter will be hereinafter referred to as the plaintiff and the former as the railroad company.

The contract of carriage alleged in the notice of motion was of one car load of Irish potatoes, containing 219 barrels, delivered by the plaintiff to the railroad company as initial carrier at Cape Charles, Va., on July 16, 1917, to be carried to Atlanta, Ga., to the plaintiff himself as consignee, to be there delivered on written order to G. A. DeWald & Co.

The notice of moton values the potatoes at $4.10 per barrel F. O. B. Cape Charles, Va., aggregating $897.90, that being the price at which they had been sold by the plaintiff to G. A. DeWald & Co., and alleges that the railroad company and its agents "negligently failed to transport said car load of Irish potatoes with reasonable dispatch and by reason of said negligence said car load of potatoes was refused by said G. A. DeWald & Co. upon arrival at Atlanta, Ga." That "upon refusal of said car load of potatoes by said G. A. DeWald & Co. at Atlanta, Ga., (the railroad company and its agents) negligently and wrongfully sold said car load of potatoes without notifying (the plaintiff and his agents) and without any authority from (the plaintiff or his agents)." That "by reason of (the railroad company's) said negligence (the plaintiff) has received nothing for said car load of potatoes," and accordingly judgment is sought against the railroad company for the said sum of $897.90 with interest thereon from July 16, 1917, until paid, being the amount of loss to the plaintiff occasioned by the railroad company's breach of contract of carriage aforesaid.

There was a trial by jury which resulted in a verdict and judgment for the plaintiff for the said $897.90 with interest thereon from July 16, 1917, until paid.

All of the evidence introduced, both by the plaintiff and defendant, is duly certified and appears in the record before us.

It also appears from the record that on the trial of the case instructions were given to the jury to which no exceptions were taken by the railroad company or the plaintiff at the time they were given, as the trial court certifies, and such court further certifies that not only were no such exceptions taken, but "on the contrary, counsel for plaintiff and defendant expressly stated to the court at the time they presented them to the court that they had agreed on the instructions."

On the return of the verdict aforesaid the railroad company moved the trial court to set it aside as contrary to the law and the evidence and for misdirection by the court of the jury. The record states that these motions were over-ruled by the trial court, and that the court over-ruled "the motion which was made on the ground of error of the court in granting the instructions" because no exceptions were taken thereto at the time they were granted and because they were presented to the court as agreed instructions as aforesaid.

The judgment under review was entered on the 22nd of November, 1919.

On the 24th day of November, 1920, more than one year thereafter, the following order was entered in vacation by the honorable judge of the trial court, namely:

"J. W. Chandler

v.

"New York, Philadelphia and Norfolk Railroad Company.

"It appearing to the court from an examination of the petition and record filed in the Supreme Court of the State of Virginia, in the above case, that the instructions given at the trial of said case in the circuit court were not made a part of the record by the clerk, and instructions having been expressly agreed to by counsel for plaintiff and counsel for defendant in the circuit court; and it further appear-

ing that counsel for the New York, Philadelphia and Norfolk Railroad Company has had due notice that an application would be made, under section 6341 of the Code of Virginia, to have said instructions made a part of the record, upon motion of J. Brooks Mapp, attorney for J. W. Chandler, it is hereby ordered that said instructions shall be and the same are hereby made a part of the record."

A certified copy of this order is presented to us, accompanied with what are certified by the clerk of the trial court to be two instructions offered by the plaintiff and one instruction offered by the defendant in the instant case. Their contents are not here given as in the opinion of the court, as will more fully appear below, they cannot be considered as a part of the record before the appellate court.

It should be stated that different counsel appeared for the railroad company in the trial court from counsel for the railroad company on the appeal before us.

Of the evidence in the case the following only need be said:

There was a bill of lading covering the shipment of the potatoes which conformed to the allegations aforesaid with respect to it in the notice of motion. It was not what is commonly known as an "order notify" bill of lading, but a species of what is commonly known as a "shipper's order" bill of lading. The consignee was the plaintiff himself, with notation on the bill of lading, "Deliver on written order to G. A. DeWald & Co." One of the railroad company's witnesses refers to this as an unusual consignment in the following language: "* * * this car was consigned to J. W. Chandler, to deliver on written order, and very few, in fact that is about the only case that I remember of a car load of potatoes being shipped that way, to deliver on written order." The plaintiff in his testimony in explaining what the notation aforesaid means, makes this state-

ment in his testimony: "The meaning of that is Mr. G. A. DeWald would have to pay for the car of potatoes to get possession of it. Instead of making it an order bill of lading shipment, where the bill of lading is to be produced to the railroad to secure the shipment, we simply attach our order to our draft, and when they pay the draft they obtain the order, and the order is delivered to the railroad company for the goods.

Q.   That also explains, does it not, why the shipment was consigned to you instead of G. A. DeWald & Company, so you could get your money before the delivery of the shipment?

A.   Yes, sir.

The defendant railroad company's line does not extend to Atlanta. Its line connects with that of the Seaboard Air Line Railway Company which does extend to Atlanta, and the shipment in question was thus transported, the last named company being the terminal carrier.

There is no conflict in the evidence as to the following facts:

The bill of lading contained the following notation on its face: "Abnormal conditions prevail on the lines of the carriers which will handle this shipment and it is subject to delay." But, during the period when the shipment in question was made, four days was the usual running time of shipments of the same character from Cape Charles to Atlanta. The plaintiff himself shipped another car from Cape Charles to Atlanta on the day after the car was shipped which is involved in this action, to-wit, on July 17, 1917, and that car arrived in Atlanta on the 21st. The car of potatoes involved in the instant case arrived on the yard of the terminal carrier, approximately five miles west of Atlanta, which is used as a part of the system of that carrier at Atltnta, as a "delivery yard for Atlanta," at 5:30

A. M. July 22, 1917. It was not placed at "foot of Spring street, where all deliveries are made," until "the night of the 23rd or the morning of the 24th prior to seven thirty A. M." The terminal carrier thereupon, on July 24, 1917, at noon, notified G. A. DeWald & Co. that the shipment was ready for delivery to them. This notice was given over the telephone, and confirmed by postal card. DeWald & Co. in reply to the notice over the telephone refused to accept delivery of the shipment. There is some conflict in the testimony as to the reason given by DeWald & Co. for such refusal, but of this it is sufficient to say that there is ample evidence in the record to have warranted the jury in finding that the refusal was on account of the delay in the transportation over the usual and expected period of four days from July 16th, the date of the shipment from Cape Charles, such delay affecting DeWald & Co. in this, that the market price of potatoes in Atlanta materially declined after the expiration of such period.

On the refusal of DeWald & Co. to accept delivery of the potatoes the terminal company, on July 24th, promptly wired the agent of the defendant railroad company at Cape Charles that the car of potatoes—giving its number— "Consigned to J. W. Chandler had been refused, and asking" (that J. W. Chandler) "advise disposition." Meanwhile the plaintiff had been informed by his New York broker, through whom the sale of the potatoes had been made to DeWald & Co., of the refusal of the latter to accept them on account of said delay in transportation. Thereupon the plaintiff took the matter up at once (by wire it is presumed) with DeWald & Co., through the broker, with the view of making an adjustment or reaching an understanding with Mr. DeWald, by which the latter would accept delivery of the potatoes. This was on the 24th. Later on the same day the agent of the defendant railroad com-

pany at Cape Charles, Mr. Savage, having received the tele-gram aforesaid from the terminal carrier, called the plaintiff over the telephone and told him the contents of the telegram.    Just here there is a conflict in the testimony for plaintiff and that for the railroad company as to what the plaintiff's reply to this notification was.    The plaintiff's testimony on this subject is as follows: "My recollection is that I told Mr. Savage that the car in question would be handled—that is, it would be taken care of. We can't always give disposition the very minute they ask disposition, be-cause it is very detrimental to do anything of that kind. We do not know that it is refused until we are notified, and we have to make other arrangements.

Q. Is it or not, along about this time a very busy season with you—not only this year but in 1917?

"A. Yes, sir."

Mr. Savage testifies that in reply to his said notification over the telephone of the contents of said telegram the plaintiff said that "the car (of potatoes) had been disposed of."    Mr. Savage still later in the day on the 24th wired the terminal carrier in Atlanta that the plaintiff said that "the car (of potatoes) had been disposed of."

The terminal carrier on the 25th wired the agent at Cape Charles, Mr. Savage, that the car of potatoes (giving its number), "has not been disposed of.   Should be handled im-mediately."    After 4.55 that afternoon Mr. Savage saw the plaintiff in person at Cape Charles and informed him of the contents of this second telegram.    Here again there is a conflict in the testimony as to what reply the plaintiff gave on the subject of the disposition to be made of the car of potatoes.   Mr. Savage testifies that plaintiff told him in re-ply to the second telegram precisely what he (Savage) wired back to the terminal carrier, and that was this: "Shipper claims consignee refusing shipment account of

some one advising car forwarded July 18th while it actually left here July 16th; declines to give disposition." The plaintiff's testimony on this subject is as follows:

"Q. You have heard Mr. Savage's testimony as to what took place on the 25th; what is your recollection of what took place at Cape Charles?

"A. My information was that the transportation company had told Mr. DeWald that that car was not shipped until the 18th, and I told Mr. Savage if the transportation company had made that statement, the car was shipped on the 16th, and until I knew better I refused to give disposition of it.

"Q. Mr. Chandler, did you abandon the car, or give it up for the railroad company to handle?

"A. No.

"Q. Did you notify Mr. Savage or anyone to that effect?

"A. No.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. I believe you testified that you were handling this car as rapidly as you could after you got notice of it?

"A. Yes, sir."

As the result of the negotiations set on foot aforesaid by the plaintiff on the 24th with DeWald & Co. through the plaintiff's broker, the plaintiff subsequently (within what time precisely does not appear from the record) reached a "satisfactory understanding with Mr. DeWald," as the plaintiff testifies, by which DeWald & Co. agreed to take the potatoes and called for them, but they were not, and could not be, delivered to him because of the following fact, namely: The terminal carrier on July 28th turned over the car of potatoes to McCullough Brothers, potato dealers in Atlanta, for sale, who promptly thereafter sold them on the market in Atlanta.

The plaintiff in his testimony stated that he could not say whether, under the arrangement made with DeWald

89

& Co., aforesaid, as a result of the negotiations set on foot by the plaintiff on July 24th, he would or would not have gotten the full amount of $897.90.

The potatoes sold on the market as just stated for $508.-60, after deducting the commissions of McCullough Brothers of $57.40 and $8.00 for labor in assorting them. This amount was received by the terminal carrier from which the latter deducted freight charges and demurrage, leaving $312.18 net balance in hand. No part of this has ever been paid to the plaintiff or offered to be paid.

The uncontradicted testimony for the plaintiff is to the effect that but for the delay in transportation he would have received said $897.90 for the potatoes as of July 17, 1917.

The following letter of the claim agent of the said terminal carrier is in evidence:

"Seaboard Air Line Railway Company,
"Portsmouth, Va., August 28th, 1917.
"CL—25523.
"Mr. J. W. Chandler,
     "Exmore, Va.
"Dear Sir:
"I have before me your letter of August 18th to our agent at Atlanta, Ga., regarding DL&W car 39485, loaded with potatoes, consigned to you to be delivered to G. A. DeWald, on written order, in which you claim that Mr. De-Wald called for his car of potatoes, and same had been delivered to McCullough Brothers, beg to advise that the car arrived at destination on July 22nd, and Mr. DeWald was notified by phone; same was refused by him on July 24th, at noon, claiming delay in transit, and stating that shipment was routed by Ga. Ry. We immediately handled with the agent of the NYP&NRR., at Cape Charles, Va., and wrote you direct requesting disposition, before disposal orders could be obtained, then shipment began to deteriorate

and I found it necessary to turn over to McCullough Brothers for handling, in order that the shipment might not become worthless, and same was sold for $312.18 net, for which we will entertain claim."

The railroad company introduced evidence tracing shipment in question while on its line, showing delivery to the Belt Line, at Pinners Point, for the said terminal carrier, on July 17th at noon, which evidence tended to show that there was no unreasonable delay in transportation up to that time. But it introduced no evidence whatever, and there is none in the record, explaining the subsequent unusual delay in the transportation. As aforesaid the car of potatoes arrived on the yard of the terminal carrier within five miles of Atlanta at 5:30 A. M. of July 22nd. The car had then been delayed in transit approximately two days longer than the usual period required therefor aforesaid, and approximately two days longer than the subsequent shipment which plaintiff made to the same place from Cape Charles on July 17th as aforesaid. There is no evidence introduced by the railroad company or in the record explaining this delay. It appears in evidence that July 22nd was Sunday, but there is no evidence that such freight was not customarily moved on Sunday; and there is no evidence explaining why the shipment was not moved on to the delivery station in Atlanta during the day of Monday the 23rd instead of being delayed there, as it was, until the movement of the car that night or "the morning of the 24th prior to seven-thirty A. M." to the delivery station. And the further delay in not notifying DeWald & Co. of the arrival of the shipment until noon of the 24th is in no way explained. The unexplained delay in the transportation therefore was four days beyond the usual time required therefor at that time.

There is no evidence tending to show that the potatoes were damaged or in any way injured physically by the

delay in transportation up to noon of the 24th day of July. Nor, indeed, is there any evidence whatever that they were at all in a damaged or injured physical condition at the time they were sold by the terminal carrier, as aforesaid, immediately following the 28th of July. There is the statement contained in the aforesaid letter of the claim agent at Portsmouth, Va., of the terminal company of August 28th, which says that "before disposal orders could be obtained then shipment began to deteriorate," etc. But this agent could have had no personal knowledge of such deterioration. Mr. McCullough, of the firm of McCullough Brothers, who sold the potatoes as aforesaid, testified as a witness for the railroad company and he does not say or indicate in any part of his testimony that the potatoes were in a damaged or injured condition when sold. On the contrary, on being asked what was the reason for the general decline in the market price of potatoes "from and after July 22nd or 23rd," he said: "Well, just the extra supply of potatoes on the market and the general decrease all over the country; Georgia potatoes were coming freely in at that time;" leaving as a reasonable inference to be drawn from his testimony that the reduced price he had just testified he obtained for the shipment of potatoes in question was due solely to the decline in the market price by the time he sold them. And no other witness testified that the potatoes were physically injured or damaged up to the time they were thus sold.

The testimony for defendant shows that the market price in Atlanta of such potatoes as those of the shipment in question was $6.00 to $6.25 per bbl. up to and including July 20, 1917; $5.00 to $5.25 per bbl. on July 21st and 23rd; and $5.00 to $5.50 on July 24th. That there was a general decline in such market price after July 22nd or 23rd but no figures are given in the evidence of such prices after July 24th; except that it appears from the gross price

obtained by McCullough Brothers immediately following July 28th for the 219 bbls. of plaintiff's potatoes as afore-said were $508.60 and $57.40 and $8.00=$574.00, or $2.62 per bbl.

*Jas. G. Martin,* for the plaintiff in error.

*Mapp & Mapp,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented for our decision by the assign-ments of error will be disposed of in their order as stated below.

[1, 2]  1. Are the instructions, referred to in the state-ment preceding this opinion, which were not certified by the judge of the trial court within the period of sixty days fixed by statute (Acts 1916, p. 722, now Code 1919, sec. 6252), a part of the record before us in this case?

This question must be answered in the negative.

The instructions are no part of the record in an action at law unless made so by bill of exceptions or certificate in accordance with the statutory requirements on that sub-ject (Acts 1916, p. 722, now Code 1919, sec. 6252, or Acts 1916, p. 708, now Code 1919, sec. 6253).  Section 6341 of the Code of 1919, under which the instructions in question were certified, has reference only to what is already a part of the record and merely authorizes selections from the record as already completed.  It does not authorize any additions to the record. *Barksdale* v. *Parker,* 87 Va. 141, 12 S. E. 344.

[3]  2. Is the loss and consequential damage which the plaintiff has suffered of the whole of the value of his goods, by reason of his loss of the sale of them, which he had made

at a stipulated price, caused by negligent delay in the transportation, followed by the subsequent conversion of the goods by the wrongful sale of them by the terminal carrier, within the operation of the "Carmack amendment," which makes the initial carrier who receives goods for interstate transportation liable "for any loss, damage or injury to such property, caused by it or by any common carrier * * * to which such property may be delivered or over whose line or lines such property may pass?"    U. S. Comp. St. §8604-a.    (The question assumes for the present that the delay was negligent and that the conversion was wrongful.)

This question must be answered in the affirmative.

Indeed, such question is expressly decided in this State by the case of *Norfolk Truckers' Ex.* v. *Norfolk Co.,* 116 Va. 466, 82 S. E. 92.    There, as in the instant case, the action was for the loss suffered by the plaintiff of the whole of the value of his goods, by reason of his loss of sale of the goods, which he had made at a stipulated price, caused by the negligent delay in the transportation, followed by the subsequent wrongful sale of the goods by the terminal carrier.    In the opinion of this court in that case, delivered by Judge Harrison, in reference to the Carmack amendment and its application to such case, this is said:    "We are of opinion that the amendment which makes the initial carrier responsible for 'loss or damage or injury to goods' is broad enough to cover a case of damage to the shipper by reason of delay.    It would be a narrow construction of the statute to confine its operation to the actual loss of goods, or to their physical injury.    The wrong for which the statute undertook to give a remedy was that done the shipper, and if the shipper has suffered loss by reason of the negligent or unreasonable delay of the carrier in the performance of its contract, it is just the same as though the loss had resulted from a physical injury to the goods or from the actual loss or disappearance of specific articles."

[4]  As said in 10 C. J., sec. 404, A. pp. 284-5: "* * *
if damage results from failure, without good excuse, to de-
liver the goods at their destination within a reasonable
time, the carrier is liable for such damages * * *  When
a carrier undertakes to convey goods, the law implies a con-
tract that they shall be delivered at destination within a
reasonable time, in the absence of any special agreement as
to the time of delivery.  This duty, it is said, is as obligatory
as the duty to deliver safely.  And the principle applies,
although there is a written contract for the shipment which
contains no stipulation as to the time within which the
goods are to be delivered.  The law will, nevertheless, imply
an understanding to carry within a reasonable time."

[5, 6]  Where, as in the *Norfolk Truckers' Ex. Case*
and in the instant case, delay in the transportation has
caused the loss of a sale at a stipulated price, such delay
is the proximate cause of the loss to the plaintiff of the
full value of the goods, where the subsequent action of the
carrier in the wrongful sale of the goods has prevented the
plaintiff from himself selling the goods on the market or
taking any other steps to minimize the damage which he
has suffered.  It is true, with respect to the elements and
measure of damages in actions involving the liability of
carriers for delay in the delivery of goods, as said in 10
C. J., sec. 4446, pp. 307-8, cited and relied on for the rail-
road company.  "Ordinarily" (the measure of damages is)
"not the value of the goods.  Delay in delivery of the
goods, even though it is such as to render the carrier liable,
does not constitute conversion, and the person entitled to
the goods cannot on that account refuse to receive them
and sue for the full value.  The measure of damages is not
the full value, since the bailor still retains the ownership,
but the loss proximately caused by the delay.  The carrier's
liability is to compensate for the damages growing out of

the delay, and not for loss; and the remedy of the party entitled to the goods is to sue for the damages he has sustained by reason of the delay. The rule proceeds on the theory that a party injured by the breach of a contract by another should take all reasonable steps to minimize the damage he will suffer." But this is where there is the delay referred to merely, and the plaintiff still retains the ownership and control of the property, so that it is within his power to take some steps, such as aforesaid, to minimize the damages. Manifestly, such rule has no application to such a case as that before us.

It is urged in argument for the railroad company that in the instant case the consignee refused to accept delivery at noon on July 24th, and that the consignor, on July 25th, refused to give any instructions for the disposition of the goods, or, if the latter be not true, that certainly the consignor did not give any instructions for the disposition of the goods within a reasonable time after the 24th of July, when he was notified of the arrival of the goods in Atlanta and the refusal of DeWald & Co. to accept delivery of them, which conduct of DeWald & Co. and the plaintiff, as is urged for the railroad company, terminated the relationship of the railroad company to the plaintiff as that of a carrier and reduced such relationship to that of a warehouseman; and that the subsequent action of the terminal carrier in selling the goods was that of a warehouseman, for which, even if wrongful, the defendant railroad company is not liable under the Carmack amendment (U. S. Comp. St. §§8604-a, 8604-aa)—citing *N. & W. Ry. Co.* v. *Stuart Draft Co.,* 109 Va. 184, 63 S. E. 415; *Hogan Milling Co.* v. *Union Pac. R. Co.,* 91 Kans. 783, 139 Pac. 397; *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 506-7, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; *Adams* v. *Great Western R. Co.,* 181 Ia. 1052, 165 N. W. 367, L. R. A. 1918B, 622.

[7]   The law is unquestionably settled, as appears from these authorities, that the. Carmack amendment does not make the initial carrier liable for a loss of or injury to goods proximately caused by the conduct of the succeeding carrier while occupying the relationship of warehouseman; and if, in the instant case, prior to July 28th, when possession of the goods was delivered to another for the sale of them, the liability of the railroad company as carrier had ceased—*i. e.,* its relationship to the plaintiff as carrier had ceased—and the relationship of the terminal carrier to the plaintiff had become that of a warehouseman, it is unquestionably true that said amendment is not applicable to the case in so far as the damages occasioned the plaintiff by the sale of the goods by the terminal carrier is concerned. In such case the chain between the original negligence as carrier, in delaying the transportation, and the total loss sustained by the plaintiff, would be broken, and the wrongful conduct of the terminal carrier in selling the goods would lose its character of being a mere incident to the original wrong and become itself the proximate cause of a part at least of the injury to the plaintiff, so that the plaintiff would not be entitled to recover in this action the whole of the damages claimed. But whether this is such a case depends, of course, upon whether the relationship of carrier aforesaid had terminated when the possession of the goods was delivered as aforesaid for sale, and that, therefore, is the crucial question in the case.

As said in *N. & W. Ry. Co. v. Stuarts Draft Co.,* just referred to:   "It is not infrequently a question of some nicety to determine the precise time at which the liability of a railroad company as carrier ceases and that of warehouseman begins."

[8]   This, however, which is quoted with approval in the opinion of this court in the case just mentioned, is said in 6 Cyc. 455:   "The carrier remains liable until the goods

90

have reached their destination and the consignee has had reasonable opportunity (involving notice of arrival when such notice is essential to charge him with the. duty of taking the goods), to receive the goods from the carrier, and that, after the expiration of such reasonable time, the liability of the carrier, if the goods remain in his possession, is that of warehouseman only.  The carrier is liable only as warehouseman after the consignee has refused to receive the goods or while the goods are held by the carrier at the request and at the convenience of the consignee."

[9]   And it must be borne in mind in the instant case that, under the terms of the bill of lading, the firm of De-Wald & Co. was not the consignee.  That firm, at the time they refused to accept delivery, at noon on July 24th, had no written order from the plaintiff authorizing the delivery to them, and hence it had no authority to refuse to accept the delivery.   Therefore, the so-called refusal of DeWald & Co. to accept delivery was nothing more than notice to the railroad company that they would not put themselves in a position to accept delivery by paying for the goods. and thus obtain the written order aforesaid.   Theretofore, DeWald & Co., as appeared from the bill of lading, was merely a conditional consignee.   Thereupon the plaintiff became the unconditional consignee and, as such, he was entitled to notice of the arival of the goods, the refusal of DeWald & Co. to qualify as consignee, and a reasonable time thereafter within which to make other disposition of the goods so as to have them taken from the hands of the railroad company.   A reasonable delay in delivery due to such a cause must often arise in the transportation business, and this, in reason, and in accordance with the substance of the holding of the authorities on the subject, must be regarded as within the mutual contemplation of the shipper and carrier at the time of the contract of carriage.

This brings us to the next question for our decision, and that is this:

3. Was the plaintiff given a reasonable time, between the notice to him on the afternoon of July 24th, of the arrival of the goods at destination and the refusal of the conditional consignee to qualify as such, and the delivery by the terminal carrier of the goods to another, on July 28th, for sale, within which to make other disposition of the goods?

This is a question of fact dependent upon all of the facts and circumstances in evidence in the case. The controverted question of fact, whether on receiving the notice in question the plaintiff expressly notified the railroad company "that the car in question would be handled," as the plaintiff testified he did, or "that the car had been disposed of," as Mr. Savage, a witness for the railroad company, testified, is an important one in this connection. The decision of this fact involved in this conflict of the testimony was peculiarly for the jury. The same is true of what occurred in the personal interview between the plaintiff and Mr. Savage on July 25th. The question of fact therein involved is whether the plaintiff by what he said to Mr. Savage on July 25th can be reasonably said to have justified the railroad company in receiving the impression that the plaintiff refused absolutely to give any instructions for other disposition of the shipment, and abandoned it to the railroad company to handle it. Then there is the statement in the letter of August 28th of the claim agent at Portsmouth of the terminal carrier, saying: "We immediately handled with the agent of the N. Y. P. & N. R. R. at Cape Charles and wrote you direct, requesting disposition, before disposal orders could be obtained, then shipment began to deteriorate, and I found it necessary to turn over to McCullough Bros. for handling, in order that the shipment might not become worthless * * *;" which tended to show that the railroad company never received the impression that the plaintiff had refused to give instructions

for disposition, but knew from what plaintiff told Mr. Savage on July 24th, that he was at work endeavoring to make other disposition, which was to be expected to be made as soon as reasonably possible, and that the terminal carrier decided to sell the goods, not because the plaintiff refused or failed to give other disposition instructions, but because of a different reason altogether, namely: because, as alleged in said letter, the "shipment began to deteriorate and I found it necessary to turn over to McCullough Bros. for handling, in order that the shipment might not become worthless." This is a self-serving declaration, long after the sale of the goods. It is not supported by a scintilla of evidence in the record. The witnesses who saw the potatoes in Atlanta make no mention of any deterioration in them, and the other testimony on the subject, which was introduced in behalf of the railroad company, gives as the sole reason for the low prices of potatoes in Atlanta after July 22nd and 23rd the general fall in prices, all as set out in the statement preceding this opinion. And there are other circumstances, which are set out in the statement just referred to, and hence need not be repeated here, which tend to show that the railroad company did not give the plaintiff the reasonable time in question and, indeed, did not itself act upon the supposition that it had done so.

Moreover, it should be said on this subject, that, so long as the railroad company continued to occupy the relationship of carrier to the plaintiff, any deterioration in the goods due to the delay in delivery was in truth proximately caused by the antecedent negligent delay of the carrier, and the carrier could not sell the goods because of such deterioration so as to escape liability for the result of such antecedent delay, and its sale of the goods because of such deterioration could only have been in recognition of such liability and in mitigation of the damages. And, as appears from said letter, in the light of the testimony in the case, the

sale was in fact made by the terminal carrier merely in apprehension of such deterioration and for the purpose of mitigating the damages.

[10]   We are of opinion, therefore, that there was ample evidence before the jury to support their verdict in finding that the reasonable time in question was not given, and hence that the relationship of the railroad company to the plaintiff still remained that of carrier at the time the potatoes were delivered over for sale, as aforesaid.

It follows from this conclusion that the delay in transportation, aforesaid, was the proximate cause of the loss and damage suffered by the plaintiff, and the railroad company is liable therefor if the facts were that such delay was due to the negligence of the railroad company or of said terminal carrier (which is a conclusion of law if it was an unreasonable delay), and that such delay was the occasion of the loss of the sale to DeWald & Co.

[11]   This brings us to the next question before us for our decision, namely:

4. Is there sufficient evidence in the record to support the verdict of the jury, which found, in effect, that there was unreasonable delay in the transportation of the goods, and that that delay was the occasion of the loss of the sale by the plaintiff to DeWald & Co.; or is that finding contrary to the evidence?

In the case of *Norfolk Truckers' Ex.* v. *Norfolk Co.,* *supra* (116 Va. 466, 82 S. E. 92), the transportation was from Herberts, Va., to Johnstown, Pa.   The shipment was delayed in transit eight days beyond the usual period required for such transportation.   Such delay in the instant case was, it is true, only four days.   But otherwise the evidence in the *Norfolk Truckers' Ex. Case* was much weaker than in that now before us to sustain the verdict of the jury for the plaintiff.

[12]    As said of the transportation of inanimate goods in 10 C. J., sec. 420 (2), p. 301: "* * * when evidence of unusual delay is adduced, a *prima facie* case of negligence is made out, and the burden then devolves on the carrier to explain the delay and to show that it arose from some cause other than the carrier's negligence or that of its agents or servants."

We deem it sufficient to say in conclusion upon the subject under consideration that the material evidence bearing thereon, and the lack of evidence adduced by the railroad company in explanation of the unusual delay, at least while the shipment was in the hands of the terminal carrier, appears from the statement preceding this opinion; and we must hold, as we held in the *Norfolk Truckers' Ex. Case, supra,* 116 Va. at p. 471, 82 S. E. 94, that "in view of the established facts and the reasonable inferences to be drawn from them, it cannot be said that the jury were without evidence to support their conclusion that there had been unreasonable delay in the carriage and delivery of the potatoes, and that such delay was the occasion of the" (conditional) "consignee's refusal to accept the shipment; nor can it be said that the verdict found was a plain deviation from right and justice."

[13, 14]    There remains but one other question for our decision, and that is the following:

5. Is the verdict of the jury invalid because it estimated the damages on the basis of the price the plaintiff was to receive under the contract of sale to DeWald & Co., plus the other proximate damage consisting in this case in loss of interest, instead of following the general rule that the measure of damages for loss of the entire value of goods occasioned by delay in the transportation of them is the market value of the goods at the place of destination at the time when the delivery of them should have been made, plus the other proximate damage, consisting in this case in loss of interest?

This question must be answered in the negative.

There is the following stipulation in the bill of lading in the instant case, namely: "The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property at the place and time of shipment under this bill of lading, including the freight charges, if paid."

This value has been construed by the courts to mean the invoice price at which the goods are sold at the time and place of shipment, with freight added to the place of destination, if paid. *Kelly* v. *Southern Railway*, 84 S. C. 249, 66 S. E. 198, 137 Am. St. Rep. 842.

While such stipulation might not be valid under the Cummings amendment of 1915 (Fed. Stat. Anno. 1916, Supp. pp. 124-5 [U. S. Comp. St. §§8592, 8604-a]) as against the shipper where there has been no such sale, or where such sale is defeated by the action of the carrier, and it appears in evidence that the stipulated value is less than the market value at destination at the time the goods should have there arrived, and the shipper seeks to recover such market value, no such case is presented by the record before us. And such stipulation, with the construction placed upon it aforesaid, is certainly valid under the circumstances of the instant case, for in such case, in the absence of any stipulation on the subject, the law would fix the same measure of damages.

As said in 10 C. J., sec. 611 (4), p. 399: "Where goods are shipped in pursuance of a sale thereof at a stipulated price which is less than the market price at destination, damages for loss or injury must be estimated on the basis of the price to be received under the contract of sale. But if the price contracted for is greater than the market value at destination, the estimate will have to be based on the market value, unless the carrier had been notified at the

time of the shipment of the fact that the goods had been sold for a higher figure."

In the instant case the stipulated price at which the goods were sold to DeWald & Co. at the time and place of shipment was much less than the market price at destination from July 16th to July 24th, inclusive; so that the market price at destination when the goods should have arrived was greater than the stipulated selling price, plus the freight, as appears in evidence.

The case will be affirmed.

*Affirmed.*

### *Upon Petition for Rehearing.*

[15]   It is urged in the petition for rehearing that the court has not given legal effect to the clause in the bill of lading involved in the case, which is as follows:

"Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) *after notice of its arrival has been duly sent* or *given* may be kept in car, depot, or place of delivery of the carrier, or warehouseman, subject to a reasonable charge for storage and to carrier's responsibility *as warehouseman* only." (Italics supplied.)

It is argued that this identical provision in a bill of lading was held valid and binding in the case of *Southern Railway Co.* v. *Prescott*, 240 U. S. 632, 36 Sup. Ct. 469, 60 L. Ed. 836; and that therefore it should be held by us as fixing the character of the liability of the terminal carrier in this case as that of a warehouseman after the expiration of forty-eight hours after both Chandler and DeWald were notified of the arrival of the goods at destination.   And the discussion by the Interstate Commerce Commission, in the *Matter of Bills of Lading,* decided April 14, 1919, 52 I. C. C. Rep. 671, at pp. 696, 700, 701 and 712, is also relied upon.   But

neither the Supreme Court decision nor the discussion of the Interstate Commerce Commission referred to sustains the position that the clause in the bill of lading in question is applicable or binding in cases of interstate shipments when the relationship of shipper and carrier has not been terminated by the expiration of a reasonable time for the removal of the goods after the giving of the notice to the party entitled to receive them.

In the *Prescott Case,* it developed in evidence on the trial that the consignee accepted the goods, took away a portion of them, and left the residue merely for his convenience until he could call for them, and, as stated in the opinion of the court, "at the close of the testimony the plaintiff withdrew his causes of action against the defendant as a common carrier  *  *  *  and the case went to the jury solely with respect to the liability of the defendant as warehouseman." The loss in the case was occasioned by fire while the goods remained in the custody of the railroad company in the admitted capacity of warehouseman. And, as clearly appears from the opinion of the court in the *Prescott Case,* and from what is said with respect to that case and other cases by the Interstate Commerce Commission in its report in the *Matter of Bills of Lading,* 52 I. C. C. Rep., at pp. 696 to 700, inclusive (referred to at p. 712), the *Prescott Case* has not changed the established rule that where the goods are not accepted, the liability of the carrier, as carrier, under the Carmack amendment, does not cease until the expiration of a reasonable time for the removal of the goods after the giving of the notice to the party entitled to receive them. And the Interstate Commerce Commission, in its said report, unquestionably recognizes that such rule was in force as late as April 14, 1919, unaffected by the clause in bills of lading which is drawn in question in the case before us, notwithstanding the *Prescott Case,* which is expressly referred to and discussed in such report.

91

Moreover, the Carmack amendment, as amended by the first Cummins amendment, which latter was approved March 4, 1915, and was in force when the cause of action in the instant case arose, expressly provides that the liability of the carrier, as carrier, imposed by the statute, should exist "notwithstanding any limitation of liability * * * in any * * * receipt or bill of lading, or in * * * any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made, is hereby declared to be unlawful and void." Therefore, even if the clause in the bill of lading in question were to be construed as attempting to fix the arbitrary limit of time therein mentioned as the time within which the relationship of shipper and carrier may be terminated by the notice prescribed therein, it would be void, under the provision of the statute just quoted, in all cases in which, under the facts of the particular case, such time is found not to be the reasonable time aforesaid.

There is but one other ground for a rehearing urged in the petition therefor, and that is to the effect that the distinction made in the original opinion between the bill of lading involved in the case and an ordinary order notify bill of lading is unsound. The distinction referred to is, as we think, a sound distinction as bearing upon the ascertainment of "the party entitled to receive" the goods as consignee. No reason is suggested why we should consider our conclusion unsound on that subject, and we see none.

The petition for rehearing will therefore be refused.

*Refused*