Staunton.

## JENNINGS AUTOMATIC DUMP BODY, INC., v. VIRGINIAN RAILWAY COMPANY.

### September 20, 1923.

1. CARRIERS—*Connecting Carriers—Liability of Initial Carrier—Carmack Amendment.*—In the instant case, an action by a shipper against an initial carrier to recover the value of an interstate shipment of goods, the liability upon the defendant, except as forwarder, if any existed, was confined to the liability which was imposed by the Federal legislation governing interstate commerce, consisting of the Carmack amendment of the act of Congress regulating commerce and the amendments thereto. (U. S. Comp. St. §§ 8604a-8604aa.)

2. CARRIERS—*Connecting Carriers—Liability of Initial Carrier—Carmack Amendment.*—The liability imposed upon an initial carrier by the Carmack amendment of the act of Congress regulating interstate commerce and the amendments (U. S. Comp. St. §§ 8604a-8604aa) thereto is precisely the same, and no more than it would have been had the initial carrier contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents. And this is so where a bill of lading is issued, as well as where no bill of lading is issued.

3. CARRIERS—*Connecting Carriers—Liability of Initial Carrier—Carmack Amendment—Whether a Particular Shipment is Embraced.*—The question of whether a particular shipment is embraced within the scope of the Carmack amendment must be determined by the essential character of the shipment and not by mere billing or mere forms of contract.

4. CARRIERS—*Connecting Carriers—Liability of Initial Carrier—Carmack Amendment—Whether a Particular Shipment is Embraced.*—Even change of title, or change of consignee, or change of destination of the goods, or the surrender of the original bill of lading and the issuance and acceptance of a new bill of lading, occurring at any time while the goods are in transit, has no effect upon the interstate character of the shipment given by the initial express or implied contract of carriage; and, hence, leaves the liability of the initial carrier still existing for any failure to perform the contract of carriage.

5. CARRIERS—*Connecting Carriers—Interstate Shipments—Bill of Lading.*— Where a bill of lading is issued by the initial carrier upon an interstate

shipment, that bill of lading governs the entire transportation, which includes delivery.

6. CARRIERS—*Connecting Carriers—Interstate Shipment—Reconsignment and Change of Destination—Abrogation of Original Contract—Case at Bar.*—In the instant case, an action by a shipper against a carrier for conversion, the shipment was interstate and the bill of lading issued by the defendant, the initial carrier, expressly embraced the provisions of interstate tariffs, which permitted reconsignment and change of destination at any time before the contract of carriage was completed. So that, if at the time the plaintiff gave to the defendant an order of reconsignment and of change of destination of the goods, the original contract of carriage had not been completed, the compliance with that order would not have abrogated the original contract, but would have been in conformity therewith, and the defendant would have been liable for the conversion of the goods if it wrongfully refused or failed to comply with such order, as, for example, if it refused to comply except upon payment of excessive storage charges. Such an order in such a situation is equivalent to a demand for delivery.

7. CARRIERS—*Connecting Carriers—Interstate Shipments—Termination of Contract of Carriage.*—It is firmly settled that the entire transportation of an interstate shipment is completed, and that there is no longer any liability upon the initial carrier for a conversion of the goods, when a change of the relationship of the terminal carrier from that of carrier to that of warehouseman of the goods occurs, or when there is a termination of the relationship of carrier by the delivery of the goods to another as warehouseman, in accordance with the provisions of the initial contract of carriage (the bill of lading, where there is one issued), not in conflict with the Carmack amendment as amended.

8. CARRIERS—*Connecting Carriers—Interstate Shipments—Termination of Contract of Carriage—Carrier Acting as Forwarder.*—Where an interstate contract of carriage has been fully performed by the completion of the entire transportation undertaken by the initial carrier, whatever obligation may rest upon the carrier at the terminus of its transportation to deliver to some further carrier, in obedience to the instructions of the owner, rests upon the carrier, not as carrier, but simply as a forwarder.

9. CARRIERS—*Connecting Carriers—Notice to Consignee or Consignor—Case at Bar.*—In the instant case, an action by a shipper against a carrier for conversion of a shipment, the plaintiff was not named as consignee in the bill of lading. The goods were "consigned to the order of," not to the plaintiff owner; and under the direction in the bill of lading "notify Penn Square Body Company, at Cleveland, Ohio," the terminal carrier at Cleveland was authorized to consider the Penn Square Body Company as the consignee and to give to it, as consignee, all the notices required by the bill of lading and the provisions of the inter-

state tariffs to be given to the consignee, in the absence of notice that the consignee had been changed and in the absence of refusal by such consignee to accept the shipment.

10. CARRIERS—*Connecting Carriers—Notice to Consignee or Consignor—Case at Bar.*—In the instant case, an action by a shipper against a carrier for conversion of a shipment, there had been no refusal by the consignee to accept the goods upon their arrival, until after the goods were stored in a public warehouse by the terminal carrier. In such a situation, no duty rested upon the terminal carrier to notify the consignor that it held the goods as warehouseman or had stored the goods with another as warehouseman. The relationship of carrier was terminated by such holding or storing of the shipment, provided the notice to the consignee of arrival of the goods required by the bill of lading and tariff provisions had been duly given, and the free time allowed by the tariffs had expired.

11. CARRIERS—*Connecting Carriers—Order Notify Bill of Lading—Notices to Consignor.*—So long as a consignor elects to continue to allow the order notify consignee to continue as such, it would be unfair to the carrier to require it to give to the consignor the notices which are required to be given to the consignee only. To do so would be the making and enforcing by the court of a contract for the parties contrary to the contract which they made for themselves, as interpreted by the Federal legislation on the subject.

12. CARRIERS—*Connecting Carriers—Notices Prior to Right of Carrier to Store Goods—Case at Bar.*—In the instant case, when the section of the bill of lading, providing that property not removed within forty-eight hours after notice of its arrival might be stored by the carrier in a public or licensed warehouse, and the tariff rules, made thereby a part thereof, are construed together, all the notice required to be given by the terminal carrier prior to the accrual of its right to store the goods in a licensed warehouse, was required to be given to the consignee only, and section E—1 of the interstate demurrage tariff, which required notice of the refusal of the consignee to accept the goods to be given to the consignor, was not applicable, because the consignee did not refuse to accept the goods while they were in the custody of the carrier. Prior to such refusal to receive the goods, which when it occurred was not made to the terminal carrier at all, but to the plaintiff, the terminal carrier had given all the notice required in order to authorize it to store the goods as it did; and such storage terminated the initial contract of carriage and all liability of the defendant, the initial carrier.

13. CARRIERS—*Connecting Carriers—Diversion of Shipment—Service Order No. 1 of the Interstate Commerce Commission—Notice to Consignee or Consignor.*—Service order No. 1 of the Interstate Commerce Commission does not require notice to be given the consignor of a diversion

of a shipment under the order, the order requires notice to be given only to the consignee, in the cases to which it is applicable. In the instant case the record did not disclose whether the consignee was or was not given notice of a diversion, but it did show that notice of arrival at destination was promptly given the consignee, which served every purpose that notice of the diversion would have served.

Error to a judgment of the Court of Law and Chancery of the city of Roanoke, in a proceeding by motion for a judgment for damages. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

This is an action by notice of motion, instituted by the plaintiff in error (hereinafter called plaintiff) against the defendant in error (hereinafter called the defendant or initial carrier), seeking to recover the value of an interstate shipment of goods by plaintiff consigned to its order, on an order notify bill of lading, the shipment beginning on the line of the defendant, on the ground that the defendant failed and refused, unless excessive and unlawful storage charges were paid by plaintiff, to reship the goods from the destination mentioned in the bill of lading, to another destination, as directed by the plaintiff, which refusal to reship and the failure of the defendant to deliver the goods at the thus designated new destination, the notice alleges amounted to a conversion thereof by the defendant.

A jury being waived, the case was heard and disposed of by the judge of the trial court, resulting in the final order and judgment under review, which is to the effect that the court being of opinion, upon the evidence, that the plaintiff is not entitled to recover, the action was dismissed, with costs against the plaintiff.

On the trial the following facts appear from the evidence introduced by plaintiff and defendant, and from

that tendered by the plaintiff, but not admitted, without conflict in any of such evidence, namely:

The shipment was made from Roanoke, under the standard form of order notify bill of lading, which was approved by the Interstate Commerce Commission by order No. 787 of June 27, 1908, reading in part as follows:

"Received, subject to classifications and tariffs," (then in effect) "at Roanoke, Va., July 26, 1920, the property described below * * marked consignee and destined as indicated below * *

"Consigned to order of Jennings Automatic Dump Body, Inc., destination, Cleveland, Ohio. Notify Penn Square Body Company at Cleveland, Ohio. Route ―――――. Car initial: C. B. & Q., Car No. 92846. Articles: Fifteen Ford dump bodies, including levers— under thirty-four inches. Two boxes of U-bolts."

\* \* \* \* \* \*

"Section 2. In issuing this bill of lading this company agrees to transport only over its own line, and except as otherwise provided by law acts only as agent with respect to the portion of the route beyond its own line. No carrier shall be liable for loss, damage, or injury not occurring on its own road or its portion of the through route, nor after said property has been delivered to the next carrier, except as such liability is or may be imposed by law, but nothing contained in this bill of lading shall be deemed to exempt the initial carrier from any such liability so imposed.

\* \* \* \* \* \* \*

"Section 5. Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier, or warehouse, subject to a reason-

able charge for storage and to carrier's responsibility as warehouseman only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

In the tariffs, applicable to interstate shipments, which were in effect when said bill of lading was issued and subject to which the goods were received, as stated in the bill of lading, were the following provisions:

### Storage Tariff Provisions.

"Storage rules and charges applicable to freight held or stored in or on railroad premises of railroads parties to this tariff.

.       *       *       *       *       *       *

### "Rule No. 2—Notification.

"Section A. Notice shall be sent or given consignee by carrier's agent, in writing, or as otherwise agreed to by carrier and consignee, within twenty-four hours (one day) after arrival of shipment and billing at destination, such notice to specify point of shipment and commodity.

### "Rule No. 3—Free Time Allowed—Section A.

"1. Forty-eight hours (two days) free time will be allowed on all commodities except the more dangerous explosives, as described in Rule 6, section A, for the removal of inbound freight from car or railroad premises, or to complete a carload shipment and furnish forwarding directions therefor.

## "Rule No. 4—Computing Time.

"Section C. On inbound freight held for removal and on freight held for reconsignment or reshipment, time will be computed from the first 7:00 A. M. after the day on which notice of arrival is sent or given to consignee.

\*  \*  \*  \*  \*  \*  \*

"Section F. When orders for freight held for disposition or reconsignment are mailed, such orders will release freight at 7:00 A. M. of the date orders are received at the station where the freight is held, provided the orders are mailed prior to the date received, but orders mailed and received on the same date release freight the following 7:00 A. M.

### *Demurrage Tariff Provisions.*

#### "Rules—Rule 1.

"Note. The disposition at point of detention determines the purpose for which a car is held and the rule applicable thereto, except where there is specific tariff provision to the contrary.

"Section A. Cars of either railroad or private ownership, held for or by consignors or consignees for loading, unloading, forwarding directions or *for any other purpose* (including cars held for loading company material unless the loading is done by the railroad for which the material is intended and on its tracks) are subject to these demurrage rules; \* \* \*."

"Item 4, Rule 2, Section A. Forty-eight hours (two days) free time will be allowed for loading and unloading all commodities. (See Rule 2, Section B, Paragraph 4.)

" 'Loading' includes the furnishing of forwarding directions on outbound cars.

\*        \*.        \*        \*        \*        \*

"Section B. On cars held for orders, surrender of bill of lading or payment of freight charges, whether such cars have been placed in position to unload or not, time will be computed from the first 7:00 A. M. after the day on which notice of arrival is sent or given to the consignee or party entitled to receive same.    (See Rule 4—Notification.)

\*        \*        \*        \*        \*        \*        .        \*

"Item 6, Rule 4—Notification.

"Section A. Notice of arrival shall be sent or given consignee or party entitled to receive same by this railroad's agent in writing, or in lieu thereof as otherwise agreed to in writing by this railroad and consignee, within twenty-four hours after arrival of car and billing at destination, such notice to contain car initials and number, point of shipment, contents, and if transferred in transit, the initial and number of original car,   *    *

\*        \*        \*        \*        \*        \*        \*

"Section E.—1. When carload freight is refused at destination, notice of such refusal shall within twenty-four hours thereafter be sent by wire to the consignor when known, at his expense, or when not known, to agent at point of shipment, who shall be required promptly to notify the shipper if known.   *    * "

On the initial way bill the defendant entered the said car, containing said goods, as routed from Deepwater, the terminus of the defendant's line, to Cleveland, over the Big Four system of railroads.   When the car arrived at Deepwater, however, the Big Four refused to undertake its transportation on account of an embargo on that system at that time,. and the embargo clerk of the defendant directed that the car be delivered at Deepwater to any other line that would take it for delivery

at Cleveland. In pursuance of this direction the car was delivered by the servants of the defendant at Deepwater to the Erie Railroad · Company, which transported the car to Cleveland, where it arrived on the evening of August 25, 1920.

No notice was given to the plaintiff, or to the embargo clerk, or other officials of the defendant, by the servants of the defendant at Deepwater, or by the Erie Railroad Company, of the fact that the shipment had been diverted and forwarded, as just stated, over the Erie line from Deepwater to Cleveland.

There was in force, at the time this diversion was made, service order No. 1 of the Interstate Commerce Commission, which, so far as material, provided as follows:

"It is ordered that   *   *   all common carriers by railroad are hereby directed to forward traffic to destination by the routes most available to expedite its movements   *   *   without regard to the routing thereof made by shippers or carriers from which the traffic is received,   *   *.

"It is further ordered and directed that in each instance where the traffic is routed, or re-routed, by carriers by railroad under the authority of this order, the carrier responsible for such routing shall, within twenty-four hours thereafter, deposit in the United States mail a notice *addressed to the consignee* of the traffic stating the car numbers and initials, places and dates of shipment, the routing and respective routes over which the traffic is moving, and that charges for the transportation of the traffic   *   *   will be the same as they would have been if such routing or re-routing had not taken place." (Italics supplied.)

At the time of the shipment from Roanoke, the plaintiff attached the bill of lading to a sight draft on the

Penn Square Body Company and forwarded the same to a Cleveland bank for collection of the draft and delivery of the bill of lading to such company upon its payment of the draft.

On the next morning after the arrival of the car in Cleveland, to-wit, at 9 o'clock A. M., August 26, 1920, the Erie Railroad notified the Penn Square Body Company of such arrival; that the car was placed on the train track ready for delivery of the goods, and that surrender of the bill of lading was required. The latter did not refuse to accept the goods, but stated that they would lift the bill of lading the next day. Thereafter the Erie Railroad called the Penn Square Body Company each day over the 'phone until Friday, September 10th, often stating that the car would be sent to storage; to which the Penn Square Body Company replied each time, either that they would lift the bill of lading the next day, or asked the Erie Railroad to wait a day or so, and stating that if that was done they would lift the bill of lading. On the last named date the Erie Railroad notified the Penn Square Body Company that the car would be delivered to the General Cartage and Storage Company on Saturday morning, the next following day, September 11th. Accordingly, the Erie Railroad delivered the car to such storage company, a public warehouse, on September 11, 1920, by which company the goods were unloaded and there held thereafter, subject to the provisions of the bill of lading aforesaid, and where the goods were held at the time of the trial of the instant case, as is indicated by but does not very clearly appear from the evidence.

No notice was sent to the plaintiff by the Erie Railroad that the goods had been stored.

Meanwhile the plaintiff, on September 8, 1920, wrote the Penn Square Body Company, stating that it had

been a good while since the plaintiff made shipment of the goods to it, but had not had any notice of their arrival, and wrote to inquire if it had received the car. The letter added that the plaintiff was of opinion that the car should have arrived long before that time, but if it had not the plaintiff would "get after the railroad company to show delivery at the earliest date possible."

The Penn Square Body Company, on September 13, 1920, wrote the plaintiff as follows:

"Gentlemen:

"Referring to the carload of bodies shipped us.

"Owing to the general business conditions here which has affected all business and has curtailed sales seventy-five per cent., we are unable to lift this draft.

"We have many jobs tied up in our factory as the owners cannot make payments. Also we cannot get our customers notes discounted and taking everything into consideration we are short of ready cash.

"We have two bodies sold and we suggest that we lift the bodies as we sell them. We will take two now and pay the storage company cash.

"Please write the General Cartage and Storage Company to accept our cash for one-fifteenth the cost plus freight charges on each body and we will get them in our hands as soon as possible."

On September 15, 1920, the plaintiff wrote the Penn Square Body Company as follows:

"Gentlemen:

"We have your letter of September 13th and regret that conditions are so unfavorable for business in your locality and hope for better prospects in the near future. We are willing to release the bodies as you suggest in your letter upon payment of charges and pro-rata payment on bodies released and at your suggestion are

writing General Cartage and Storage Company accordingly, as per copy herewith enclosed. * * *"

The letter of the plaintiff to the General Cartage and Storage Company, Cleveland, Ohio, referred to in their letter next above mentioned, was as follows:

"Gentlemen:

"With reference to a carload of bodies shipped by us to Penn Square Company, bill of lading attached, you may release these bodies one or more at a time upon payment of freight and accumulated charges and one-fifteenth of amount of draft on each body released, or $147.50."

The last named letter was returned to the plaintiff by the General Cartage and Storage Company with the notation thereon, "No bill of lading."

On September 24, 1920, the plaintiff wrote the Penn Square Body Company stating that since the aforesaid letter of September 15th to that company the plaintiff had concluded that such company should take up the goods "entire," as the price was a cash proposition, and the plaintiff was not willing to carry the investment and give such company the advantage of the proposition, selling on a consignment basis. The letter added that if such company was "unable to do this," the plaintiff would, as stated in a former letter, send a representative to the company "in about a week or ten days with instructions to dispose of this car of bodies;" and asking for a reply, stating that the plaintiff would be governed accordingly.

On September 29, 1920, the Penn Square Body Company wrote the plaintiff, stating: "It is impossible for us to lift this car of bodies."

On October 4, 1920, the plaintiff wrote the general freight agent of the defendant as follows:

"Dear Sir:

"We are enclosing copy of bill of lading for car C. B. & Q. 92846, shipped to our order, notify Penn Square Body Company, Cleveland, Ohio, July 26, 1920.

"We were informed indirectly, not by the railroad, however, that these bodies are in storage in Cleveland and that the Penn Square Body Company has failed to take them up. We, therefore, ask that you divert this car and ship it straight bill of lading direct to Beard and Company, Louisville, Ky.

"We shall also appreciate your giving this matter your very prompt attention."

The general freight agent of the defendant, not having any information up to this time as to the storage other than that given in said letter of plaintiff of October 4th, and not having been informed that the car had been diverted to the Erie Railroad as aforesaid, supposed that the car was being held in storage in Cleveland by the Big Four, as terminal carrier. Hence, in a telephone conversation with the plaintiff preceding or following the receipt of said letter of October 6th, the general freight agent of the defendant directed the plaintiff to deliver the original bill of lading to the Big Four at Cleveland.

Accordingly, the plaintiff wired the aforesaid Cleveland bank, on October 5, 1920, to deliver the original bill of lading to the Big Four railroad, which was promptly done; and on October 6, 1920, the general freight agent of the defendant wrote the Big Four referring to the shipment as described in the initial way bill aforesaid, adding as follows:

"I have just been requested by Jennings Automatic Dump Body, Inc., to have this shipment diverted as a straight shipment to Beard and Company, Louisville, Ky.

"The agent at Roanoke advises me that shippers have wired" (the aforesaid Cleveland bank—naming it) "to deliver the original order notify bill of lading to you.

"Will you kindly make the diversion, advising me when accomplished."

A copy of this letter was sent to the plaintiff and the receipt of such copy acknowledged by letter of plaintiff, of date October 8, 1920, stating that the plaintiff was "glad to notice that you have ordered diversion" as stated, and asking to be notified as soon as it was learned that the car was on its way.

Thereafter, following certain correspondence not material to be mentioned, the defendant, as of December 10, 1920, ascertained for the first time that the aforesaid shipment was sent to storage with the General Cartage and Storage Company, Cleveland, Ohio, by the Erie Railroad; and the general freight agent of the defendant wrote the plaintiff of date December 13, 1920, conveying this information to the plaintiff.

After further correspondence, not material to be referred to, the plaintiff, on March 5, 1920, filed with the defendant a statement of its claim, being the same as that sued on.

After still further correspondence, not necessary to be mentioned, the defendant, through its general claim agent, wrote the plaintiff on April 23, 1921, a letter, which, so far as material, was as follows:

"The situation is that the dump bodies are at Cleveland with freight charges amounting to something over one hundred dollars and storage charges amounting to something like $600 due on them. My suggestion to you is that you pay these charges and dispose of the goods, or that you have them forwarded to some other point to be delivered to the final consignee on payment of all the charges—freight charges from Cleveland to

the new destination; then present your claim to recover the amount paid as storage and the difference between the value of the goods now and the value at the time the shipment was made. I cannot promise that such a claim will be paid, but the handling of the matter as I suggest will put you in the position of having minimized the loss to the lowest possible amount, and will shape the matter up so that the entire transaction may be handled on its merits. I think it well for you to act quickly. The storage charges are accumulating daily and the longer the matter remains in its present status the worse the situation becomes."

This closed the correspondence and all communication between the plaintiff and defendant, and on June 23, 1921, this action was brought.

*R. K. Spiller* and *M. P. Burks, Jr.*, for the plaintiff in error.

*Hall, Wingfield & Apperson, Williams, Loyall & Tunstall*, and *W. C. Plunkett*, for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The decision of the case turns upon a single question, namely:

1. Was notice from the terminal carrier, the Erie Railroad, to the plaintiff, the consignor, of the fact that the goods would be, or were, stored in the public warehouse, where they were in fact stored on September 11, 1920, essential in order to terminate the contract of carriage?

The question must be answered in the negative.

[1-5] The shipment being an interstate shipment, the liability upon the defendant (except as forwarder), if

any exists, is confined to the liability which is imposed by the Federal legislation governing interstate commerce, consisting of the Carmack amendment of the act of Congress regulating such commerce and the amendment thereto (U. S. Comp. St. § §8604a, 8604aa). *C. & O. R. Co.* v. *Bank*, 122 Va. 471, 95 S. E. 454, and cases cited. The liability thus imposed upon the defendant, the initial carrier, is precisely the same as, and no more than, it would have been had it "contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents. *Atlantic, etc., R. Co.* v. *Riverside Mills*, 219 U. S. 186, 196, 31 Sup. Ct. 164, 55 L. Ed. 167, 178, 31 L. R. A. (N. S.) 7. And, under the Carmack amendment, what has been just stated is the test of liability of the initial carrier, where bill of lading is issued, as well as where no bill of lading is issued (*C. & O. R. Co.* v. *Bank, supra*, 122 Va. 471, 95 S. E. 454); and the question of whether a particular shipment is embraced within the scope of the Carmack amendment must be determined by the essential character of the shipment and not by mere billing or mere forms of contract (*Chicago, etc., R. Co.* v. *Iowa*, 233 U. S. 334, 34 Sup. Ct. 592, 58 L. Ed. 988, 992); even change of title (*Gulf, etc., R. Co.* v. *Texas*, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540), or change of consignee, or change of destination of the goods, or the surrender of the original bill of lading and the issuance and acceptance of a new and different bill of lading (*Missouri, etc., R. Co.* v. *Ward*, 244 U. S. 382, 37 Sup. Ct. 617, 61 L. Ed. 1213; *Atchison, etc., R. Co.* v. *Harold*, 241 U. S. 371, 36 Sup. Ct. 665, 60 L. Ed. 1050), occurring at any time while the goods are in transit, that is, at any time before the contract of carriage is completed, having no effect upon the interstate character of the shipment given by the initial express or implied contract of carriage; and,

hence, leaving the aforesaid liability of the initial carrier still existing for any failure to perform such contract. And, where a bill of lading is issued by the initial carrier upon an interstate shipment, that bill of lading "governs the entire transportation." (*Missouri, etc., R. Co.* v. *Ward,* just cited.) Moreover, the entire transportation "includes delivery." (*Georgia, etc. R. Co.* v. *Blish Milling Co.,* 241 U. S. 190, 36 Sup. Ct. 541, 60 L. Ed. 948, 952.)

[6] In the instant case, the shipment was interstate and the bill of lading issued by the defendant, the initial carrier, expressly embraced the provisions of interstate tariffs, which permitted reconsignment and change of destination at any time before the contract of carriage was completed. So that, if at the time the plaintiff gave to the defendant the order of reconsignment and of change of destination of the goods to be made at Cleveland, the original contract of carriage had not been completed, the compliance with that order would not have abrogated the original contract, but would have been in conformity therewith, and the defendant would have been liable for the conversion of the goods if it wrongfully refused or failed to comply with such order (*Atchison, etc., R. Co.* v. *Schriver,* 72 Kan. 550, 84 Pac. 119, 4 L. R. A. [N. S.] 1056), as, for example, if it refused to comply with the order except upon payment of excessive storage charges. 4 R. C. L. 837; 10 C. J. 273-4. As held in the case next above cited, such an order in such a situation "is equivalent to a demand for delivery."

[7, 8] But, it is firmly settled that the entire transportation of an interstate shipment is completed, and that there is no longer any liability upon the initial carrier for a conversion of the goods, when a change of the relationship of the terminal carrier from that of carrier

to that of warehouseman of the goods occurs, or when there is a termination of the relationship of carrier by the delivery of the goods to another as warehouseman, in accordance with the provisions of the initial contract of carriage (the bill of lading, where there is one issued), not in conflict with the Carmack amendment as amended. *N. Y., P. & N. R. Co.* v. *Chandler,* 129 Va. 695, 106 S. E. 684; *Southern Ry. Co.* v. *Prescott,* 240 U. S. 632, 36 Sup. Ct. 469, 60 L. Ed. 836; *Adams Express Co.* v. *Croninger,* 226 U. S. 491, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; *Gulf, etc., R. Co.* v. *Texas,* 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540. And where the interstate contract of carriage has been fully performed by the completion of the entire transportation undertaken by the initial contract (which is the situation, as aforesaid, when the relationship, as carrier, of the terminal carrier has been changed or terminated as just stated), as said by the Supreme Court in *Gulf, etc., R. Co.* v. *Texas, supra,* 204 U. S. at p. 412, 27 Sup. Ct. at p. 363, 51 L. Ed. at p. 546: "Whatever obligation may rest upon the carrier at the terminus of its transportation to deliver to some further carrier, in obedience to the instructions of the owner, it is acting, not as carrier, but simply as a forwarder."

[9-12] Now the instant case is different from *N. Y., P. & N. R. Co.* v. *Chandler, supra* (129 Va. 695, 106 S. E. 684), and from many other cases involving order notify bills of lading found in the books, in this: The plaintiff, owner, it will be observed, is not, in the instant case, named as consignee in the bill of lading. The goods were "consigned to the order of," not to the plaintiff owner. Under the direction in the bill of lading, "notify Penn Square Body Company, at Cleveland, Ohio," the terminal carrier at Cleveland was authorized to consider such company as the consignee

and to give to it, as consignee, all the notices required by the bill of lading and the provisions of the interstate tariffs aforesaid to be given to the consignee, in the absence of notice that the consignee had been changed and in the absence of refusal by such consignee to accept the shipment. In that situation the Penn Square Body Company remained the consignee unless and until it refused to accept the shipment. And in the instant case there was no refusal by such consignee to accept the shipment, until after the goods were stored in the public warehouse by the terminal carrier, the Erie Railroad, on September 11, 1920. All of the authorities which have been cited before us on this point are to the effect that, in such a situation, no duty rests upon the terminal carrier to notify the consignor that it holds the goods as warehouseman or has stored the goods with another as warehouseman; and that the relationship of carrier is terminated by such holding or storing, provided the notice to the consignee of arrival of the goods required by the bill of lading and tariff provisions involved has been duly given, and the free time allowed by the tariffs has expired. 4 A. L. R., note, pp. 1290-1. And such holding would seem to be but fair and just. So long as the consignor elects to continue to allow the order notify consignee to continue as such, it would be unfair to the carrier to require it to give to the consignor the notices which are required to be given to the consignee only. To do so would be the making and enforcing by the court of a contract for the parties contrary to the contract which they made for themselves, as interpreted by the Federal legislation on the subject. In the instant case, when section 5 of the bill of lading and the tariff rules, made thereby a part thereof, are construed together, all the notice required to be given by the terminal carrier prior to the accrual of its right to

store the goods in a licensed warehouse, as was done, was required to be given to the consignee only. Section E-1 of the interstate demurrage tariff, offered by the plaintiff in evidence, which requires notice of refusal of consignee to accept the goods to be given the consignor, is not applicable to the instant case, for the reason that the consignee did not refuse to accept the goods while they were in the custody of the carrier. Prior to such refusal (which when it occurred was not made indeed to the terminal carrier at all, but to the plaintiff direct), the terminal carrier had given all the notice required, as aforesaid, in order to authorize it to exercise its right of election to store the goods as it did, and had so stored them; which action, under the Supreme Court decisions above cited, terminated the initial contract of carriage and all liability of the defendant thereunder. The defendant did not thereafter owe any duty to the plaintiff under such contract, except, perhaps, as forwarder.

Whether the defendant is liable to the plaintiff for damages for default in the discharge of its duty to the plaintiff, in the relationship of forwarder, is not a question which is involved in the case as presented by the pleadings and assignments of error before us. Hence, we do not pass upon that question in any way, affirmatively or negatively.

[13] Service order No. 1, offered in evidence by the plaintiff, is relied on for the plaintiff as requiring notice of the diversion of the shipment to be given to it; but even if otherwise applicable (which we do not decide), that order did not require any notice of the diversion of the shipment over the line of the Erie Railroad, which was made at Deepwater, to be given to the plaintiff, consignor. That order required notice of the diversion to be given only to the consignee, in the cases to which

it was applicable. The record does not disclose whether the consignee was or was not given, at the time of the diversion to the Erie Railroad line, notice thereof, but it does show, as aforesaid, that promptly after arrival of the goods at Cleveland notice of such arrival was given the consignee by the Erie Railroad Company, and information as to where the car was placed to permit the unloading of the goods by the consignee, which served every purpose that notice to the consignee of the aforesaid diversion would have served if given at the time of the diversion, many days before the goods were stored as aforesaid.

The judgment under review will be affirmed, with provision in our order, however, to the effect that such judgment shall in no way prejudice the plaintiff, nor shall what we have said above in any way prejudice the plaintiff or defendant, in any proceeding the plaintiff may institute, if so advised, against the defendant for damages for default or breach of duty as forwarder.

*Affirmed.*